IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| REBECCA RENEE LEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-3189-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rebecca Lee seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in improperly evaluating the

impact of plaintiff's substance abuse problem and by failing to give proper weight to the

opinions of two psychologists and a psychotherapist. She further argues that the Appeals

Council erred in failing to remand for consideration of new and material evidence.  I find that

the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not

disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

## I.    BACKGROUND

On February 21, 2008, plaintiff applied for disability benefits alleging that she had

been disabled since May 1, 2007.  At a subsequent administrative hearing she amended her

alleged onset date to June 1, 2011, after earning $11,783.07 in 2009 and $15,674.54 in 2010

(Tr. 101-102).  Plaintiff's application was denied initially.  On November 25, 2009, a hearing

was held before an Administrative Law Judge.  On January 27, 2010, the ALJ found that

plaintiff was not under a "disability" as defined in the Act.  On May 5, 2011, the Appeals

Council granted plaintiff's request for review and remanded her claims for a new

administrative decision. A second hearing was held on May 1, 2012. On November 30, 2012, plaintiff was again found not disabled. On March 8, 2013, the Appeals Council denied plaintiff's request for review despite her presentation of additional evidence. Therefore, the November 30, 2012, decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative

decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

>       Yes = not disabled.
>       No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and documentary evidence admitted at the hearing and presented to the Appeals Council.

### A.     EARNINGS RECORD

The record establishes that plaintiff earned the following income from 1991 through 2011:

| Year | Earnings | Year | Earnings |
|------|---------|------|---------|
| 1991 | $ 2,555.21 | 2002 | $ 853.15 |
| 1992 | 3,266.69 | 2003 | 0.00 |
| 1993 | 0.00 | 2004 | 2,774.00 |
| 1994 | 4,269.46 | 2005 | 2,566.02 |
| 1995 | 3,316.20 | 2006 | 6,510.90 |
| 1996 | 0.00 | 2007 | 3,427.11 |
| 1997 | 79.32 | 2008 | 4,924.48 |
| 1998 | 2,433.88 | 2009 | 11,783.07 |
| 1999 | 6,494.42 | 2010 | 15,674.54 |
| 2000 | 10,758.40 | 2011 | 0.00 |
| 2001 | 2,754.64 | | |

(Tr. at 304-320).

### B.     SUMMARY OF MEDICAL RECORDS

On July 11, 2005, plaintiff was treated by Thomas Kuich, M.D., of St. John's Regional Health Center-Marian Center. Plaintiff admitted to anger episodes, seeing and talking to the

dead, and being assaulted by her husband. Plaintiff admitted to drinking alcohol as a teenager and using methamphetamine once every two to three months. The doctor reported that plaintiff appeared at times preoccupied, her affect was depressed, and her intelligence was estimated to be above average. Plaintiff was admitted with a diagnosis of depressive disorder. Plaintiff's medications were Nicotine patch, Haldol (treats schizophrenia), **Ativan (also called Lorazepam, treats anxiety and is a Schedule IV controlled substance)**, and Cogentin.[1] Plaintiff had an acute urinary tract infection on testing dated July 12, 2005. Plaintiff was discharged on July 14, 2005, with recommendation for community resources and treatment (Tr. 750-767).

On December 1, 2005, plaintiff was treated by a clinician at St. John's Regional Health Center Emergency Room with the complaint that she was unable to stop crying. Plaintiff admitted to drinking alcohol 20 years previously and had last smoked methamphetamine in July. Plaintiff indicated she had calmed down after being seen in the ER and discharged (Tr. 768-773).

On April 9, 2007, plaintiff was treated at CoxHealth Emergency Services for right ureteral stone[2] (confirmed by CT scan) with nausea (Tr. 452, 558-571). Plaintiff was admitted to the CoxHealth Hospital by Mark Milne, M.D., of Milne Urology Clinic on April 10, 2007. A stent was placed without complication resulting in dramatic improvement in her right flank pain, and she was discharged on April 11, 2007, with prescriptions for **Darvocet-N (narcotic)**, Levbid (treats bladder spasms), and Pyridium (treats pain and burning from urinary tract infections) (Tr. 452, 460-462, 480-484, 553-557).

---

[1]Cogentin is used to treat Parkinson disease in combination with other medicines. It is also used to control tremors and stiffness of the muscles due to certain antipsychotic medicines. Cogentin is an anticholinergic. It works by decreasing the effects of acetylcholine, a chemical in the brain. This results in decreased tremors or muscle stiffness.

[2]A ureteral stone is a kidney stone that has left the kidney and moved down into the ureter, the tube between the kidney and the bladder.

On April 13, 2007, plaintiff was treated at CoxHealth Emergency Services for right flank pain and vomiting. Zofran (prevents nausea and vomiting) and Pepcid (reduces stomach acid) were prescribed (Tr. 541-552).

On April 20, 2007, plaintiff was seen by Mark Milne, M.D., who removed plaintiff's ureteral stent. He provided her with an additional antibiotic (Tr. at 454).

May 1, 2007, was plaintiff's original alleged onset date.

On August 16, 2007, plaintiff was treated by Gregory Hunter, M.D., at CoxHealth Emergency Services for complaints of chest pain, slurred speech, headache and nausea. "She has a very odd affect, answering almost every single question with the prefix, 'Well, you know, the funny thing about that is.'" Plaintiff denied smoking, doing drugs, or using alcohol. ECG,[3] CT scans of head and chest x-rays were normal. Plaintiff had no recurrence of her symptoms in the emergency department and she was discharged with a diagnosis of urinary tract infection and headache. She was prescribed Cipro, an antibiotic (Tr. 522-540).

Six days later, on August 23, 2007, plaintiff was treated at CoxHealth Emergency Services for complaints of blood in her urine which was confirmed by urinalysis. Plaintiff was advised to continue her Cipro as prescribed and to follow up with Dr. Milne (Tr. 510-521).

Six days later, on August 29, 2007, plaintiff was treated by Mark Milne, M.D., for reported flank pain, pressure and blood in her urine. Plaintiff stated that she had suffered a heart attack and a stroke since her last visit (which was four months earlier). Urinalysis confirmed blood in her urine. Macrodantin (antibiotic) was prescribed (Tr. 459, 464).

On October 8, 2007, plaintiff was treated at CoxHealth Emergency Services for low back pain radiating down her left leg for three days. Lumbar spine radiographs showed mild

---

[3]An ECG (also known as EKG) is an electrocardiogram, a test that checks for problems with electrical activity of the heart.

degenerative spondylosis.[4] Plaintiff was prescribed Flexeril (muscle relaxer) and Motrin (non-steroidal anti-inflammatory) (Tr. 499-509).

On October 11, 2007, plaintiff was treated by a chiropractor at Lane Chiropractic. The chiropractor reported that plaintiff had a tight band around the lumbosacral region but no radiating pain (Tr. 437-440, 810-813). Chiropractic adjustment was administered on October 15, 2007, and October 17, 2007, for her complaints of continued low back pain and stiffness (Tr. 440, 813).

On October 17, 2007, plaintiff was treated by Jim Elam, M.D., of St. John's Clinic for complaints of chronic low back pain, nephrolithiasis (kidney stone), history of assault and aggressive behavior, gastroesophageal reflux disease ("GERD"), questionable mood disorder currently not treated, and restless leg syndrome. Plaintiff complained of weight gain, sleeping frequently, depression, mind racing, irritability, and frequent verbal aggression. Dr. Elam reported that plaintiff's back was diffusely tender to palpation in the lumbosacral area extending to the sacroiliac area bilaterally. Plaintiff's gait was normal and there was no evidence of sensory abnormality of the lower extremities. The rest of her exam was normal, and she was observed to be fairly pleasant.

Plaintiff admitted that she does drink, but not heavily, and she was smoking 5 to 10 cigarettes per day. Plaintiff had third-degree assault charges pending due to what she called a "spanking incident" with her child -- both of her children had been placed in foster care. Plaintiff reported that she had been seen in the emergency room one month earlier for a heart attack or stroke but was then discharged from the emergency room. Dr. Elam noted that her

---

[4]Spondylosis refers to degeneration of the spine. As with many other terms to describe spinal problems, spondylosis is more of a descriptive term than it is a diagnosis. Literally it can be translated to mean that one has both pain and spine degeneration, regardless of what is causing the pain or where the degeneration is occurring.

described symptoms sounded more like a panic attack. "The patient has recently been on Percocet for her back pain. . . . I have asked the patient to get off of narcotic pain medication for her back. I will be happy to give her tramadol, but that will be the strongest medication I will prescribe for her back. She has taken some issue with this and states she needs something stronger. I have informed her that if she needs something stronger, she will need to find somebody else to take care of her." Dr. Elam's impression was situational disturbance, mood disorder, and low-back pain without sciatica. He refilled her cyclobenzaprine (also called Flexeril, a muscle relaxer). The doctor encouraged plaintiff to continue with chiropractic or physical therapy (Tr. 445-446).

On October 31, 2007, plaintiff was treated by Matthew Stinson, M.D., at Jordon Valley Community Health Center for complaints of depression, crying spells, and change in sleep and eating patterns. Plaintiff reported poor concentration. Dr. Stinson's assessment was depression. He prescribed Celexa (anti-depressant) and recommended continued counseling (Tr. 586).

On November 28, 2007, plaintiff returned to Matthew Stinson, M.D., at Jordon Valley Community Health Center, and complained of vomiting, nausea, dark stool, and increasing fatigue. Dr. Stinson assessed plaintiff with GERD and depression and added Prilosec (reduces stomach acid) to her prescriptions (Tr. 583-585).

On January 9, 2008, plaintiff was treated by Matthew Stinson, M.D. His assessment was increased urinary frequency, resolved; esophageal reflux; urinary tract infection; depression; and sleep-related movement disorder. The doctor prescribed Requip (treats restless leg syndrome), Bactrim (antibiotic), and Mirapex (treats restless leg syndrome) in addition to Celexa (antidepressant) and Prilosec (reduces stomach acid) (Tr. 580-582).

On January 31, 2008, plaintiff was treated by Matthew Stinson, M.D., for recurrent urinary tract infection with symptoms of discomfort and increasing pain. The doctor noted

plaintiff had mild suprapubic tenderness. Urinalysis was positive for nitrite. Ciprofloxacin (antibiotic) was prescribed (Tr. 578-579).

On February 7, 2008, plaintiff was examined by Eva Wilson, Psy.D. In the problem and symptoms section, Dr. Wilson reported that plaintiff had her children removed twice by the Division of Family Services ("DFS"), once based on abuse by plaintiff's husband and a second time for abuse by her (Tr. 447). Plaintiff reported that she was unable to work due to depression (Tr. 447). Later, plaintiff reported that she was unable to work due to concentration and identity problems (Tr. 448). Dr. Wilson reported that plaintiff appeared to be in a mildly to moderately depressed mood with affect consistent with mood. Plaintiff's speech was extrapolative and her thought content and perception were discouraged. On the mini-mental status evaluation, plaintiff's scores placed her in the borderline range of intellectual and memory functioning. The doctor indicated that plaintiff did not produce a valid profile on the Minnesota Multiphasic Personality Inventory test because she took a great deal of time to take the test, obsessing over each question and writing words around the questions, and that this indicated plaintiff was either exaggerating her mental state or crying out for help. Dr. Wilson suspected plaintiff was doing both and stated that plaintiff appeared to be impaired at this time by depression and personality problems. Plaintiff tended to lose her identity and be very obsessive. Plaintiff was suffering from depression, which would cause her to have a great deal of difficulty maintaining full-time employment because of her inability to concentrate. The doctor's diagnostic impression was depressive disorder not otherwise specified; major depression, recurrent, severe without psychotic features; borderline personality disorder; rule out borderline intellectual functioning; and history of substance abuse.  She assigned a global

assessment of functioning ("GAF") of 50.[5] (Tr. 448-449).

On February 20, 2008, plaintiff's urinalysis at Quest Diagnostics showed methicillin-resistant staphylococcus aureus ("MRSA")[6] (Tr. 472-475).

On February 21, 2008, plaintiff applied for disability benefits.

One week later, on February 28, 2008, plaintiff was treated by Mark Milne, M.D., of Milne Urology Clinic for significant urinary frequency and pain at end of voiding. Plaintiff had been unable to clear her infection despite rounds of Cipro and Bactrim. Dr. Milne stated that plaintiff was healthy but anxious, and she appeared to be in no acute distress. An abdominal ultrasound was performed and showed a shadowing suspicious for bladder calculus (bladder stone). Urinalysis confirmed continued MRSA infection. Doxycycline (antibiotic) was prescribed (Tr. 458, 465-466, 471, 478, 497-498).

Five days later, on March 5, 2008, plaintiff was admitted to CoxHealth by Mark Milne, M.D., for complaints of bladder stones. Plaintiff's past medical history included possible bipolar disease and MRSA urinary tract infection (Tr. 478-479, 492- 494). The following day plaintiff underwent a cystitholapaxy, which is the breaking up and removal of the bladder stone (Tr. 468- 469, 476-477, 490-491, 495-496, 776).

Six days later, on March 14, 2008, plaintiff reported feeling "great" since her surgery (Tr. 458).

On March 31, 2008, plaintiff reported to Mark Milne, M.D., that she felt markedly better following removal of the stone. Plaintiff stopped the antibiotics after surgery. Urinalysis

---

[5]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[6]Methicillin-resistant Staphylococcus aureus infection is caused by a strain of staph bacteria that has become resistant to the antibiotics commonly used to treat ordinary staph infections.

had some bacteria and epithelial cells. Dr. Milne's impression was bladder stone and pseudomonal (a type of bacteria) urinary tract infection (Tr. 457, 467, 489, 779).

On April 11, 2008, plaintiff saw Matthew Stinson, M.D., at Jordon Valley Community Health Center with complaints of depression and dizziness, and she had questions about the effectiveness of her medications. Plaintiff was participating in counseling and "is continuing to see good results." Dr. Stinson assessed fatigue and depression. "Discussed the mind body spirit connection and the possibility of a spiritual component to her disease. Will treat as schizophrenia.[7]" He prescribed Abilify (treats schizophrenia, bipolar disorder and depression) and Effexor (anti-anxiety) (Tr. 574-577).

On May 5, 2008, Dr. Stinson treated plaintiff for foot pain and trouble sleeping. Plaintiff reported doing "very well" on Abilify -- her energy level had increased and she was dealing with difficulty situations "okay." The doctor noted that plaintiff had tenderness to palpation on her left heel and pain with extreme dorsiflexion (bending the ankle joint by lifting the foot up). Dr. Stinson assessed plantar fasciitis[8] and depression. He prescribed Lunesta (treats insomnia), Abilify (treats schizophrenia), and Celexa (treats depression). He wrote, "Continue pain medicine as needed" however he did not prescribe any pain medicine. Exercises were given to plaintiff for stretching of her plantar fascia (Tr. 605-606).

---

[7]"Schizophrenia is a severe brain disorder in which people interpret reality abnormally. Schizophrenia may result in some combination of hallucinations, delusions, and extremely disordered thinking and behavior. Contrary to popular belief, schizophrenia isn't a split personality or multiple personality. The word 'schizophrenia' does mean 'split mind,' but it refers to a disruption of the usual balance of emotions and thinking. Schizophrenia is a chronic condition, requiring lifelong treatment."
http://www.mayoclinic.org/diseases-conditions/schizophrenia/basics/definition/con-20021077

[8]Plantar fasciitis is inflammation of the thick tissue on the bottom of the foot. This tissue is called the plantar fascia. It connects the heel bone to the toes and creates the arch of the foot.

On May 22, 2008, plaintiff saw Mark Milne, M.D., and reported "some pain" in her right mid back. "She has had an increased amount of lifting over the last 3 weeks helping her mother move." Plaintiff had some tenderness in her back. She was assessed with back pain. "Suspect this is more of a strain on the paraspinous muscle." She was told to take over-the-counter Aleve once a day for ten days. She also had an abdominal scan that day which showed complete resolution of her bladder stone and no kidney stone. (Tr. 621, 777-778).

On June 18, 2008, Elisa Lewis, Ph. D., reviewed plaintiff's medical records and completed a Psychiatric Review Technique (Tr. 592-603). The assessment covered the period from April 1, 2007, to June 18, 2008. The doctor found plaintiff's mental impairments not severe based on affective disorders and personality disorders (Tr. 592). The doctor found plaintiff to have a borderline personality disorder (Tr. 597) and indicated that the degree of limitation was mild in only two areas: (1) social functioning and (2) concentration, persistence, or pace (Tr. 600).

On June 19, 2008, plaintiff saw Matthew Stinson, M.D., with complaints of constipation and chest pain relieved after taking Prilosec (reduces stomach acid). She requested a colonoscopy referral. Her abdomen was tender to palpation in the left lower quadrant. Dr. Stinson diagnosed constipation and depression and referred plaintiff for a colonoscopy (Tr. 605, 607).

On June 9, 2008, Becky Breckner, LPC NCC, of the Center for Resolutions, submitted a statement of her services for plaintiff during the period between 2007 and 2008. Ms. Breckner stated that she had been treating plaintiff since April 23, 2007. Plaintiff was treated on 28 occasions through November 13, 2007, and then resumed her sessions on January 25, 2008 with 18 sessions conducted through June 4, 2008. Ms. Breckner stated plaintiff's chief complaint was depression with extreme difficulty sleeping. Plaintiff reported overwhelming

emotions related to her case with the Missouri Division of Children's Services and her marital problems. Plaintiff reported significant weight gain, feelings of fatigue, loss of energy, inability to think and concentrate, and indecisiveness. Plaintiff reported bad days that involved not getting dressed or getting out of bed. Plaintiff made improvement in the earlier year, specifically working with Jordon Valley Clinic on medication management and working through a stressful separation and divorce from her husband. Plaintiff reported that her marriage was characterized by physical, emotional and verbal abuse, which at times caused her to be depressed. Plaintiff reported physical ailments that interfered with her everyday functioning. Plaintiff reported that her lack of resources to meet medical and psychiatric needs on a consistent basis interfered with her ability to hold consistent employment. Plaintiff reported that once the case with the State is closed, she will no longer be able to receive services without paying for them herself. Ms. Breckner indicated this would be an unreasonable expectation on the State's part (Tr. at 590-591).

On August 26, 2008, plaintiff was treated by Dace Miller, M.D., at CoxHealth Systems. Plaintiff underwent a colonoscopy that was normal other than hemorrhoids (Tr. 623-622).

On September 16, 2008, plaintiff was treated in the Emergency Department at CoxHealth Systems for complaints of head and neck pain with nausea and dizziness. Plaintiff reported that her sudden onset headache "[felt] like when **I last shot up meth one month ago**." She was listed as a smoker. She was given **Dilaudid (narcotic)** through IV twice and Toradol (non-steroidal anti-inflammatory) once before being discharged. (Tr. 624-631).

The following day, on September 17, 2008, plaintiff was seen by William Graham, M.D., at Jordon Valley Community Health for complaints of headache and depression. Plaintiff reported being at the Cox South ER the previous day with headache, sudden onset, occipital in location and blurry vision, slurred speech, and nausea. By her report all testing at the ER was

normal. Plaintiff said she had been discharged with a prescription for **Tramadol (narcotic-like pain reliever)**, which only partially relieved her pain. Dr. Graham's assessment was basilar migraine headache (starting at the base of the brain) vs. vasculitis (inflammation of the blood vessels caused by the immune system attacking blood vessels by mistake) vs. MS[9] and depression. The doctor prescribed **ASA/butalbital/caffeine/codeine[10] (narcotic)** for the headache (Tr. 607-608).

The next day, on September 18, 2008, plaintiff returned to the Emergency Department at CoxHealth reporting recurring occipital headache. She said her past medical history included schizophrenia and chronic back pain. Plaintiff was given Toradol (non-steroidal anti-inflammatory), **Dilaudid (narcotic)** and Phenergan (for nausea) through IV and released (Tr. at 632-647).

On September 19, 2008, plaintiff underwent a head CT which was normal (Tr. 648).

On September 26, 2008, plaintiff returned to the Emergency Department with reports of recurrent severe headaches. A MRI and Cerebral Angiography were done which were normal. She received an IV injection of **Dilaudid (narcotic)** and Phenergan (for nausea) before being discharged (Tr. 649-658).

On October 9, 2008, plaintiff was treated by Matthew Stinson, M.D. at Jordon Valley Community Health Center for excessive sleepiness, headaches, and depression. Plaintiff admitted to suicidal thoughts over the last month and presented with flat affect. Dr. Stinson spoke with the crisis team who recommended an alcohol and drug screen. He ordered blood

---

[9]I assume this means multiple sclerosis, an autoimmune disease that affects the brain and spinal cord.

[10]ASA is aspirin butaltital is a barbiturate which relaxes muscle contractions involved in a tension headache, caffeine is a central nervous system stimulant which relaxes muscle contractions in blood vessels to improve blood flow, and codeine is an opioid pain medication sometimes called a narcotic.

work. Dr. Stinson's assessment was amphetamine dependence in remission and headache. He suspected her headache and fatigue were related to depression. Plaintiff was referred to the crisis team (Tr. 609- 610).

On October 31, 2008, plaintiff was seen by Matthew Stinson, M.D., to follow up on blood test results which showed Hepatitis C. Plaintiff was vaccinated against Hepatitis A and Hepatitis B and was advised to avoid alcohol. (Tr. at 610-611).

On December 24, 2008, plaintiff was seen in the Emergency Department at CoxHealth for sudden onset of chest tightness with radiation to back and right shoulder. Chest x-rays were normal and her ECG was normal and unchanged from her last one on August 16, 2007. Plaintiff was treated with a GI cocktail (a mixture of medications for stomach acid) and released (Tr. 659-669).

On January 9, 2009, plaintiff was treated by Matthew Stinson M.D., at Jordon Valley Community Health. Plaintiff complained of stomach pain and vomiting "every day for the past three weeks", and expressed concerns about Hepatitis C. "She did elect to consider a treatment for Hepatitis C because she is an alcoholic. She drinks approximately 3 to 4 beers at a time . . . on the weekend. She has not had any problems during the week." Dr. Stinson's assessment was alcoholic cerebellar degeneration. He ordered blood work and prescribed Ranitidine (treats heartburn and acid indigestion). "Discussed Hepatitis C treatment at length. Will refer for evaluation although I told her that she was probably not a good candidate because of her mood difficulties. I recommended treatment for alcoholism instead." (Tr. 611-612).

On January 22, 2009, plaintiff was treated by Erin Greer, M.D., of the orthopedic department of Ferrell-Duncan Clinic for complaints of bilateral thumb pain and hand numbness. Dr. Greer's findings were consistent with advanced bilateral thumb basal joint arthritis and clinical features consistent with carpal tunnel syndrome. Plaintiff was provided

with thumb basal joint injections and splints. Plaintiff's medications were listed as Ranitidine (for GERD), Aleve (over-the-counter non-steroidal anti-inflammatory), Benadryl (antihistamine), **Tramadol (narcotic-like pain reliever)**, Norvasc (treats hypertension and chest pain), aspirin, Robaxin (muscle relaxer), Celexa (treats depression), Spiriva Handihaler (for COPD), Albuterol (for COPD), Premarin (female hormone), and Ketoprofen (non-steroidal anti-inflammatory). Electrodiagnostic studies were recommended (Tr. 798-802).

On February 28, 2009, plaintiff was treated by a staff physician in the Emergency Department at CoxHeath for headaches. She reported a history of schizophrenia and bipolar disorder, and she was listed as a smoker. Plaintiff's CT scan was normal. She was given an injection of **Nubain (narcotic)**, Phenergan (for nausea) and Norflex (muscle relaxer) (Tr. 670-679).

Three days later, on March 3, 2009, plaintiff returned to CoxHealth for treatment of migraine headaches. Plaintiff was treated with Thiamine (vitamin B), Phenergan (for nausea) and **Dilaudid (narcotic)** and was released (Tr. 680-688).

On April 28, 2009, plaintiff went to the Emergency Room at CoxHealth for complaints of hematuria (blood in the urine) and lumbar pain. She said her pain felt like a kidney stone. The record says "Rx given" however, the record does not appear to indicate what prescriptions or treatment was given. (Tr. 689-695).

Three days later, on May 1, 2009, plaintiff returned to the Emergency Department reporting that her right flank pain had increased. A CT scan showed possible kidney stone and diverticulosis[11] of descending and sigmoid colon. Plaintiff was assessed with a kidney stone and

---

[11]Diverticular disease is a condition that occurs when a person has problems from small pouches, or sacs, that have formed and pushed outward through weak spots in the colon wall. Each pouch is called a diverticulum. Multiple pouches are called diverticula. The colon is part of the large intestine. The large intestine absorbs water from stool and changes it from a liquid to a solid form. Diverticula are most common in the lower part of the colon, called the sigmoid

urinary tract infection. She was given Toradol (non-steroidal anti-inflammatory), Zofran (for nausea), **Morphine (twice) (narcotic)**, and Ciproflaxacin (antibiotic)through IV. Plaintiff was discharged with prescriptions for Ciprofloxacin and **Tramadol (narcotic-like pain reliever)**. Plaintiff's medications were listed as Abilify (treats schizophrenia), Celexa (treats depression), Cyclobenzaprine (muscle relaxer), Requip (treats restless leg syndrome), and Trazodone (for anxiety) (Tr. 696-706).

On May 7, 2009, plaintiff was admitted to CoxHealth for worsening back pain and right lower quadrant pain. A CT scan and ultrasound showed an ovarian cyst. Plaintiff admitted to smoking occasionally and a past history of alcohol abuse, but denied other drug use. She also denied headaches and chest pain (Tr. 712, 804). She had no tenderness in her back on exam. Plaintiff was treated for an unrelated condition and was discharged the following morning (Tr. 707-719, 803-808).

On June 11, 2009, plaintiff returned to Ozarks Community Hospital and reported tenderness in both right and left heels. Dr. Bricker recommended stretching and prescribed Mobic (non-steroidal anti-inflammatory) (Tr. at 748).

On August 2, 2009, plaintiff returned to Dr. Bricker at Ozarks Community Hospital complaining about tenderness and pain in both heels. The doctor noted mild gait disturbance and diagnosed plantar fasciitis (see footnote 8, page 11). The doctor injected her right heel with depomedrol and recommended calf stretches (Tr. 747).

---

colon. The problems that occur with diverticular disease include diverticulitis and diverticular bleeding. Diverticulitis occurs when the diverticula become inflamed, or irritated and swollen, and infected. Diverticular bleeding occurs when a small blood vessel within the wall of a diverticulum bursts. When a person has diverticula that do not cause diverticulitis or diverticular bleeding, the condition is called diverticulosis. Most people with diverticulosis do not have symptoms. Some people with diverticulosis have constipation or diarrhea.

On August 7, 2009, plaintiff was evaluated by Matthew Stinson, M.D., for medication recheck on her depression, anxiety, and right knee pain. The doctor noted she had right knee tenderness along the medial aspect of the patella. X-rays showed overgrowth on the bone on the medical side of the knee almost touching the patella. The doctor's assessment was right knee joint pain and depression. He prescribed Lunesta (treats insomnia) and referred plaintiff for orthopedic evaluation (Tr. 612-613).

On September 4, 2009, William Duncan, M.D., an orthopedic specialist at Ferrell Duncan Clinic, treated plaintiff for complaints of recurrent right knee pain which reportedly had been ongoing for many years. Plaintiff denied drug and alcohol use but admitted to tobacco usage. The doctor found plaintiff's gait and station normal with adequate muscle strength and tone. X-rays of plaintiff's right knee showed severe right knee degenerative joint disease with bone-on-bone wear of the medial compartment and an anterior subluxation of the femur relative to tibia.[12] Plaintiff's knee was injected with DepoMedrol. Her prescribed medications were listed as Celexa (treats depression), Abilify (treats schizophrenia), **Tramadol (narcotic-like pain reliever),** Lunesta (treats insomnia), Requip (treats restless leg syndrome), and Mobic (non-steroidal anti-inflammatory) (Tr. 615-619).

On September 4, 2009, plaintiff was treated at Outpatient Rehabilitation by a clinician for knee pain. A lateral wedge orthotic was recommended to assist with relieving her pain (Tr. 781-783).

On September 6, 2009, plaintiff was admitted to CoxHealth Emergency Systems for right upper quadrant pain. Plaintiff reported increased coffee consumption. She admitted to continued smoking, said she had a history of alcohol use but none at the present, and she

---

[12]Subluxation of the knee is a partial dislocation due to ligamentous injury and the knee feels as if it has "given out."

denied drug use. Physical and psychological exams were normal. CT scan of the abdomen and pelvis was negative. Plaintiff was given Compazine (for nausea) and **Morphine (narcotic)** via IV. She was diagnosed with gastritis. Plaintiff was told to avoid caffeine and alcohol and she was given a prescription for **Vicodin (narcotic).** (Tr. 720-732).

Three days later, on September 9, 2009, plaintiff returned to the Emergency Department for abdominal pain complaints. CT scan of the abdomen was negative. Physical and psychological exams were normal. Plaintiff admitted to continued smoking and a past history of alcohol use but denied current alcohol use and denied any drug use. She was given **morphine (narcotic) twice** through her IV along with Compazine (for nausea). Plaintiff was assessed with epigastric pain. The clinician suspected plaintiff may have a peptic ulcer and suggested follow up with a primary care physician (Tr. 733-745).

On Friday, October 16, 2009, plaintiff was seen in the CoxHealth Emergency Services for complaints of sore throat and cough. Her cough was described in the record as a "smokers cough." Plaintiff admitted smoking but denied a history of alcohol or drug use. Her physical and psychological exams were normal. Plaintiff was diagnosed with viral syndrome and a strep culture was taken. She was advised not to work until Wednesday, October 21, 2009, or after her symptoms resolved, whichever came first (Tr. 784-793).

On November 5, 2009, plaintiff had a bilateral renal ultrasound which was evaluated by Anbari Martin, M.D., a radiologist at CoxHealth Systems. The ultrasound showed no stone and no hydronephrosis (kidney swelling) (Tr. 827).

On November 19, 2009, Becky Breckner, LPC NCC, of the Center for Resolutions, completed a Medical Source Statement - Mental giving her opinion of plaintiff's ability to do work-related activities on a sustained basis (eight hours a day for five days a week, or an

equivalent work schedule). Ms. Breckner opined that plaintiff had no evidence of limitations in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to ask simple questions or request assistance

- The ability to travel in unfamiliar places or use public transportation

She found that plaintiff was moderately limited in the following:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to set realistic goals or make plans independently of others

She found that plaintiff is markedly limited in the following:

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

Ms. Breckner stated that plaintiff has the ability on a sustained basis, i.e., 8 hours per day, 40 hours per week, to make judgments that are commensurate with the functions of unskilled work, i.e., simple work related decisions; she is able to respond appropriately to supervision, coworkers, and usual work situations; and she is able to deal with changes in a routine work setting. Ms. Breckner commented that plaintiff reported needing increased breaks at work due to physical pain and discomfort (Tr. 795-796).

November 25, 2009, was plaintiff's first administrative hearing in connection with her application for disability benefits.

On December 2, 2009, plaintiff was treated by Edward Skeins, M.D., at CoxHealth Emergency Services for complaints of lower abdominal pain radiating into her back. Plaintiff presented looking very uncomfortable and had mild left lower quadrant tenderness. Plaintiff was described as "miserable with pain" by Dr. Skeins. Plaintiff reported a previous ovarian cyst and previous kidney stone, and said this pain was similar to both. CT scans were negative but a left ovarian cyst was confirmed on ultrasound. Plaintiff was "rendered pain free" with injections of Zofran (for nausea), **Morphine (narcotic)**, and Toradol (non-steroidal anti-inflammatory). The clinical impression was left ovarian cyst with history of kidney stones, although there were no positive test results on this visit. Dr. Skein recommended plaintiff stop Tramadol (narcotic-like pain reliever) due to the possibility of serotonin syndrome when used with Celexa (treats depression) and to use **Hydrocodone (narcotic)** for pain instead. He gave her Hydrocodone to use at home (Tr. 828-844).

On December 20, 2009, plaintiff was treated at CoxHealth Emergency Services for migraine headaches. Plaintiff was given Phenergan (for nausea) and Toradol (non-steroidal anti-inflammatory) through IV and was prescribed Phenergan and **Fioricet (treats tension headaches, contains a barbiturate and is a Schedule III controlled substance)** (Tr. 853-862).

On January 17, 2010, plaintiff was treated at CoxHealth Emergency Services by Gregory Hunter, M.D., for an exacerbation of restless leg syndrome resulting in difficulty sleeping for three nights. She denied any other complaints. She was observed to be alert, pleasant and cooperative. Her physical exam was normal. Plaintiff was given an injection of **Valium (treats anxiety and is a Schedule IV controlled substance)** and told to follow up with her primary care doctor (Tr. 863-872).

On January 22, 2010, plaintiff was treated by Donna Steward[13] at Jordon Valley Community Health for complaints of back pain radiating down her leg and into her head. The assessment was herniated disc at L5-S1. Non-steroidal anti-inflammatories were recommended along with rest and ice (Tr. 1062-1063).

The following day, on January 23, 2010, plaintiff was treated by Douglas Horn, D.O., at CoxHealth Emergency Services for acute low back pain. Plaintiff was observed to be cooperative and pleasant. Examination showed pain moderate in the lumbar area. Plaintiff range of motion was normal, but painful, with all movement. Plaintiff was given a prescription for **Norco (narcotic)** and told to follow up with her treating doctor (Tr. 873-876).

Two days later, on January 25, 2010, plaintiff was treated by Matthew Stinson, M.D., at Jordon Valley Community Health for complaints of back pain radiating into her left leg. "Patient had an incident at work where she was lifting multiple things and then went into the

---

[13]There is no indication on this medical record as to whether Donna Steward is a doctor, nurse practitioner, physician's assistant, etc.

kitchen to pick up a bottle and had severe excruciating back pain that would radiate down into her left leg. She has been off work since then. This was 5 days ago. . . . She has been controlling this with pain medication." Dr. Stinson reported that her back was tender to palpation over the lower lumbar spine and left paraspinal muscles. Plaintiff had a positive straight leg test on the left. Plaintiff was prescribed Prednisone, a steroid, and told to exercise and use anti-inflammatory medication. She was given a work excuse for one week (Tr. 1060-1061).

On January 27, 2010, the ALJ entered the first order denying plaintiff's application for disability benefits.

One week after her appointment with Dr. Stinson, on February 1, 2010, plaintiff returned to see Dr. Stinson for a follow up. Plaintiff reported improvement in her pain although she continued to have pain with flexion of her neck. The doctor noted tenderness over the bilateral hip areas and assessed a herniated disc at L5-S1 central. The doctor recommended plaintiff return to work with a 20-pound weight restriction and continue stretching exercises (Tr. at 1064-1065).

On February 8, 2010, plaintiff reported complete resolution of her back pain and indicated she "might return to work." Plaintiff also stated that Abilify (treats schizophrenia) continued to help with her symptoms and that sometimes she would double her dose. Dr. Stinson noted no back tenderness and indicated that plaintiff may return to work without restriction (Tr. 1066-1067).

One month later, on March 8, 2010, plaintiff was treated by Chad Nall, a physician's assistant at Ferrell-Duncan Clinic, for complaints of right knee pain. Plaintiff reported that she was taking Celexa (treats depression), Abilify (treats schizophrenia), **Tramadol (narcotic-like pain reliever)**, Lunesta (treats insomnia), Requip (treats restless leg syndrome), and Mobic

(non-steroidal anti-inflammatory). "We performed a cortisone injection to her right knee last September.  This provided her with significant and lasting relief. She reports a gradual return in her painful symptoms over the last 3-4 weeks." Plaintiff was observed to be alert and oriented with appropriate mood and affect. Mr. Nall's assessment was right knee pain and right knee severe degenerative joint disease. He injected her knee with Depo-Medrol and Sensorcaine and recommended follow up as needed (Tr. 877-880).

On April 18, 2010, plaintiff was treated by Juliah Tiedemann, M.D., at CoxHealth South for complaints of pain and possible kidney stone. CT scan was negative for kidney stone or hydronephrosis (kidney swelling). Plaintiff was diagnosed with pyelonephritis (urinary tract infection involving the kidney) and prescribed Cipro (antibiotic) and **Percocet (narcotic)** (Tr. 887-900).

Four days later, on April 22, 2010, plaintiff was treated by Tommy Trent, D.O., at CoxHealth South for a 1st degree burn on the right hand. Plaintiff was prescribed **Vicodin (narcotic)** (Tr. 901-909).

On May 3, 2010, plaintiff was treated by Matthew Stinson, M.D., at Jordon Valley Community Health for complaints of kidney pain and possible kidney stone. The doctor noted plaintiff had tenderness to palpation over the right flank. Urine tests revealed no blood in the urine.  Dr. Stinson's assessment was dysuria (painful urination) but provided no treatment for that condition, and he increased her dosage of Requip due to continued complaints of restless leg syndrome (Tr. 1068-1069).

One week later, on May 10, 2010, plaintiff was treated by Nurse S. Michael, at the Family Medical Walk-In Clinic for complaints of weakness, severe fatigue, and severe headache. Plaintiff was given an injection of Toradol (non-steroidal anti-inflammatory) and

was prescribed an illegible medication. Aleve was recommended for her headache (Tr. 883-886).

On May 12, 2010, plaintiff was treated by Gregory Hunter, M.D., at CoxHealth South for flank pain. CT scan showed no acute abnormality. Plaintiff was prescribed Toradol (non-steroidal anti-inflammatory) (Tr. 910-927, 940-941).

On May 21, 2010, plaintiff was treated by Joseph Craigmyle, M.D., at CoxHealth South for migraine headaches. Plaintiff was given an injection of Benadryl (antihistamine), Toradol (non-steroidal anti-inflammatory), and Reglan (for nausea) and oral Requip (treats restless leg syndrome) (Tr. 928-939).

Five days later, on May 26, 2010, plaintiff was seen by Matthew Stinson, M.D., for complaints of possible diabetes (she reported a strong family history of diabetes and her own urinary frequency over the past three days which had since resolved) and shoulder discomfort. The doctor reported that plaintiff had pain on active abduction as well as external rotation of both shoulders with a negative cross arm test. The doctor assessed her with subacromial bursitis and suggested anti-inflammatories and avoidance of lifting over her shoulder level for two weeks. The doctor recommended a blood sugar level lab test and urinalysis, and he suggested that plaintiff work on weight loss (Tr. 1070-1071).

On June 21, 2010, plaintiff returned to see Matthew Stinson, M.D., for continued shoulder pain. Joint injections were administered for acute shoulder impingement. The doctor prescribed **Tramadol (narcotic-like pain reliever)**, Lunesta (treats insomnia), and Requip (treats restless leg syndrome) (Tr. 1072-1073).

On July 1, 2010, plaintiff returned to Matthew Stinson, M.D., with complaints of continued shoulder pain and migraine headache. Joint injections were again administered. Dr. Stinson prescribed Imitrex for her migraine and also Flexeril (muscle relaxer), Requip (treats

restless leg syndrome), Lunesta (treats insomnia), and **Tramadol (narcotic-like pain reliever)** (Tr. 1074-1076).

On July 8, 2010, plaintiff was examined by Sharol McGehee, Psy.D., who administered a clinical interview, mental status exam and the Millon Clinical Multiaxial Inventory-Third Edition (MCMI-III). Plaintiff described having hallucinations and delusions. "At one time she believed that 'her father was God and that she was married to Jesus'. She also believed that her father 'kicked my husband out of heaven, and he is responsible for the world situation'. She perceives people to be angels. She reportedly spends most of her time struggling with delusions." Dr. McGehee observed that on the day of this exam, plaintiff was oriented to time, place, person and purpose. Plaintiff reported that she had been working at Hobby Lobby for the past 7 1/2 years.

Dr. McGehee reported that plaintiff was actively delusional and met the criteria for a paranoid delusional disorder. Ideas of reference, thought control or thought influence appeared to be present. The doctor opined that plaintiff's behavior could deteriorate into more aggressive acts stimulated by her delusional thinking; that plaintiff was addicted to methamphetamine but had been clean for three years after completing a rehabilitation program at Carol Jones Recovery Center; plaintiff reported using alcohol once a month and then she drinks to get drunk. Plaintiff reported having contracted Hepatitis C by mainlining methamphetamine.

Test results were consistent with paranoid schizophrenia. The doctor opined that plaintiff had both schizotypal and paranoid personality traits and was then experiencing paranoid delusions. Dr. McGehee's assessment was as follows:

Axis I:        Schizophrenia, paranoid type

Axis II:       Schizotypal and paranoid personality traits

*****

Axis IV:     Problems with primary support system . . .
             Problems with access to healthcare - lack of funds to pay for needed
             healthcare [although to this point plaintiff had been receiving very
             frequent medical care and there is no indication in any record that she
             was unable to obtain medication, frequent scans, treatment, etc.]

Axis V:      GAF 21[14]

(Tr. at 944-956).

On July 10, 2010, plaintiff was treated by Cami Porter, M.D., at CoxHealth South

Emergency Department for complaint of an overdose and altered mental status. Plaintiff said

she had consumed five drinks and three Requip tablets, resulting in intractable vomiting. "The

patient has not recently seen a physician." Plaintiff admitted to smoking a half a pack of

cigarettes per day, only rarely using alcohol, and she denied use of street drugs. "[T]he patient

reports quitting approximately 3 years ago, IV drugs." On exam plaintiff was observed to be

alert and orient times three with normal behavior, normal mood, and normal affect. She was

noted to be cooperative and calm with no thoughts or intent to harm herself or others. She

was given IV Zofran (prevents nausea and vomiting). Plaintiff was prescribed Phenergan

suppositories for nausea and released in stable condition (Tr. 958-961).

Twelve days later, on July 22, 2010, plaintiff was treated by Juliah Tiedemann, M.D., at

CoxHealth South Emergency Department for complaints of heat exposure, syncope (fainting)

with headache, nausea, and vomiting. Plaintiff had been working out in her yard and the heat

index was 110 degrees. She felt lightheaded and went to get a drink and fainted on the way.

"The patient has not recently seen a physician." CT scan of the head was negative. Her exam

---

[14]A global assessment of functioning of 21 to 30 means behavior is considerably influenced
by delusions or hallucinations or serious impairment in communication or judgment (e.g.,
sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to
function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

was completely normal except for headache. Behavior, mood and affect were all normal. Plaintiff was given an injection of **Morphine (narcotic)** and released in improved condition (Tr. 962- 966).

On September 2, 2010, plaintiff was treated by Matthew Stinson, M.D., for complaints of low back pain worsening while at work. Plaintiff was tender to palpation over the lower lumbar spine and bilateral paraspinal muscles. An injection of Lidocaine/Kenalog for plaintiff's shoulder discomfort was administered, and she was given Prednisone (steroid) for her back pain. (Tr. 1077-1079).

Six days later, on September 8, 2010, plaintiff was treated by Samuel Alexander, M.D., of CoxHeath South Emergency Department for complaints of acute knee pain. "At their worst the symptoms were moderate, in the emergency department the symptoms have resolved." She reported a medical history of restless leg syndrome and herniated disk. Dr. Alexander's examination was positive for tenderness of the lateral aspect of right knee. He observed that her gait was steady. X-rays of right knee showed mild tricompartmental osteoarthritis. Plaintiff was given an injection of **Demerol (narcotic)** and Phenergan (for nausea) and released to follow up with her treating doctor (Tr. 967-970).

Later that month, on September 27, 2010, plaintiff was treated by Michael Galindo, D.O., at CoxHealth South Emergency Department for complaints of headache and flank pain. "Patient has not recently seen a physician." Plaintiff reported a medical history consisting of restless leg syndrome, herniated disc, and migraines. Her symptoms were limited to abdominal pain, nausea and headache. All other symptoms were denied. Dr. Galindo described plaintiff as friendly, cooperative, awake and alert, oriented times four. She was observed to be walking without difficulty. She had no tenderness in her back and full range of motion. Her physical exam was entirely normal except for mild abdominal tenderness. CT scan of the abdomen

showed possible diverticulitis and hepatic steatosis.[15] Plaintiff was given an injection of **Morphine (narcotic)**, Compazine (for nausea) and Zofran (prevents nausea), and she was given a prescription for **Vicodin (narcotic)**. (Tr. 971-975).

Three days later, on September 30, 2010, plaintiff returned to the Emergency Department at CoxHealth South for treatment of vomiting and abdominal pain. "The symptoms/episode began/occurred gradually, 4 day(s) ago." I note that plaintiff was treated in this emergency room three days earlier with an injection of Morphine and was given a prescription for Vicodin on discharge at that time. On exam this day she had moderate abdominal and back tenderness. The rest of her physical exam was normal. Abdominal x-rays were normal. Plaintiff was given an injection of **Morphine (narcotic)** and was given a prescription for **Percocet (narcotic)** (Tr. 976-979).

Less than a month later, on October 22, 2010, plaintiff was treated by Howard Jarvis, M.D., at CoxHealth South Emergency Department for complaints of a fall injury with resulting ankle sprain. X-rays of left ankle and foot were normal. Plaintiff was given an injection of **Morphine (narcotic)** and discharged with a prescription for **Norco (narcotic)** (Tr. 980-983).

On January 17, 2011, plaintiff was treated by Dennis Kenyon M.D., at CoxHealth Emergency Department for complaints of shoulder pain. Dr. Kenyon reported plaintiff had decreased range of motion and pain of the right shoulder. X-rays of her right shoulder were normal. Plaintiff's exam was entirely normal except for limited range of motion and pain in her shoulder and she appeared anxious. She was diagnosed with shoulder pain and given a prescription for **Vicoprofen (narcotic)** (Tr. 984- 987).

---

[15]Also called fatty liver disease. The fat that accumulates in the liver can cause inflammation and scarring in the liver.

The next day, on January 18, 2011, plaintiff was seen by Mark Ross, M.D., at CoxHealth South Emergency Department for complaints of headache. Plaintiff was given an injection of **Nubain (narcotic)** and Compazine (for nausea) and discharged in improved condition (Tr. 988-989).

On February 28, 2011, plaintiff was treated by Matthew Stinson, M.D., for complaints of severe, constant left shoulder pain. Plaintiff also reported an episode of memory loss during a conversation with a coworker. The doctor noted that plaintiff had limited range of motion of her shoulder with pain, and cited plaintiff's report of carrying firewood in her left arm before her symptoms began. Dr. Stinson observed that plaintiff's memory was intact, she was alert and fully oriented. Plaintiff was advised to refrain from strenuous exercise and to use ice and daily passive range of motion exercises. Plaintiff insisted she must continue going to work. (Tr. 1080-1082).

On March 22, 2011, plaintiff was treated by Samir Garcia, M.D., at CoxHealth for shortness of breath and chest pain. Plaintiff had been using a "legal meth alternative." "Patient used some drug, 'crystallized plant food' Saturday (2 days ago) to get high, she is previous Meth user." Plaintiff reported having used mephadrone two days earlier. "She has also been very anxious and depressed because of financial issues.  She reports she has been severely fatigued for the last month but goes on to say that she has been using Mephadrone, a new legal meth, and she has been feeling worse since she has been on it." All of her tests, including ECG, stress test, and CT angiography of the chest, were normal. She was alert and fully oriented with normal mood and affect. Plaintiff was told to stop smoking and stop using the legal meth alternative, and she agreed to stop. She was discharged with a recommendation to eat a heart-healthy diet and engage in activity as tolerated. (Tr. 990-1008).

Three days later, on March 25, 2011, plaintiff was treated by Matthew Stinson, M.D., for complaints of chest pain and vomiting. The doctor reported her cardiovascular system appeared normal. His assessment was anxiety, infectious colitis (inflammation of the large intestine caused by bacteria), enteritis (inflammation of the small intestine), and gastroenteritis (stomach flu). The doctor prescribed hydroxyzine for her anxiety and expected spontaneous resolution of her gastrointestinal problems. (Tr. 1083-1085).

On April 5, 2011, plaintiff went to the emergency room at CoxHealth South and was treated by David Lee, M.D., for suicidal ideation. Plaintiff was on no psychiatric medications at the time. "Patient tried to inject a synthetic drug (mephadrone?), also injected bleach, olive oil. Took 250 mg of hydroxyzine, cut wrist and AC spaces. Has been abusing mephadrone recently. States she works only to pay bills and is sick of it." Plaintiff had been brought to the emergency room by police after telling a city utility worker, after being told that her utilities would be disconnected, that she was going to kill herself. Plaintiff became belligerent and defiant when transferred to CoxHealth North. The doctor noted that her liabilities included negativity, drug use and resistance to efforts to ascertain ways to help her, as well as poor money management skills.

> She insists that her life is just too hard because half of every paycheck goes for taxes, insurance, retirement and child support and that she does not feel she has enough money each month to live on. She does acknowledge that using some of her money for these substances including having spent her entire paycheck on these substances over the weekend is a bad idea but she seems to continue taking minimal responsibility for the predicament she is now in.

Plaintiff admitted that she owns her home and does not owe anything on it. She was smoking 1 1/2 packs of cigarettes per day. James Neal, M.D., noted that plaintiff was very uncooperative and blamed Dr. Neal for the possibility that she would lose her job. Plaintiff's admission diagnoses had been substance abuse, severe stressors due to behavior, drug use and

31

finances, and a GAF of 20 to 25.[16] Her discharge diagnoses included mephadrone abuse;

substance induced mood disorder; severe stressors due to behavior, drug use and finances; and

a GAF of 45 to 48.[17] By April 8, 2011, the "heavy use of Mephadrone which is an over-the-

counter abusable product also known as bath salts, plant food or kitty litter had now cleared.

She had made arrangement with her mother to be supervised more on weekends. Her mother

was also going to help her with organizing her bill paying." Plaintiff was discharged on April

8, 2011, with a prescription for Effexor (treats anxiety) (Tr. 1009-1023).

On May 5, 2011, the Appeals Council remanded plaintiff's case for a second hearing

and reconsideration.

June 1, 2011, is plaintiff's amended alleged onset date.

On June 21, 2011, plaintiff was treated by Shahid Kaous, M.D., at CoxHealth North for

complaints of depression, hallucinations, and suicidal ideation. Plaintiff's husband had called

an ambulance after plaintiff began hallucinating from injecting bath salts (Mephadrone).

Plaintiff admitted to using amphetamine, opioids, cocaine and "others." Plaintiff was admitted

to the hospital for treatment. "She has reported multiple times that she will never give up using

bath salts and other substances of abuse that she was actively using. . . . She was provided with

all the resources available for substance abuse treatment." Plaintiff stated that she "loves bath

salts, she loves heroin, she loves meth and whatever we might do, she will go out and she will

start doing it again." At the beginning of her hospitalization, plaintiff attacked the medical

---

[16]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[17]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

doctor and had to be put in restraints.

　　During the course of her hospitalization, she was stabilized with medication "although it will primarily be waiting for her to clear from the effects of the drug of abuse." According to the record, plaintiff was "currently struggling with financial issues because she has recently lost her job." Plaintiff said she thought she was possessed so she could not go to work. She began actively participating in the program and did not display any psychotic or aggressive behaviors but instead was cooperative. She was discharged on July 6, 2011. She agreed to pursue outpatient programs and follow with the Kitchen Clinic. Plaintiff's discharge diagnosis was other substance-induced mood disorder (Mephedrone), polysubstance dependence, and depressive disorder not otherwise specified. Her GAF at discharge was 44 (see footnote 17, page 32). Plaintiff's medications at discharge were Nexium (treats GERD), Neurontin (also called Gabapentin, treats restless leg syndrome), Paxil (treats depression), Vistaril (treats anxiety), Ibuprofen (non-steroidal anti-inflammatory), Imitrex (for migraine headaches), Zolpidem (treats insomnia), and Zyprexa (an anti-psychotic which treats schizophrenia or bipolar disorder) (Tr. 1030-1046).

　　Nine days after her discharge, on July 15, 2011, plaintiff was treated by Bernard Kennetz, M.D., at CoxHealth South Emergency Department for complaints of shortness of breath. "She feels back to baseline now. The event occurred several hours ago." Plaintiff did not display signs of respiratory distress and her chest x-rays were normal. Plaintiff was assessed with anxiety reaction and given a prescription for **Xanax (a schedule IV controlled substance)** (Tr. 1047-1052).

　　On September 8, 2011, plaintiff was treated by Cami Porter, M.D., at CoxHealth South Emergency Department with an injection of Toradol for complaints of migraine headache. She was observed to be alert, oriented, and cooperative. (Tr. 1100-1109).

Four days later, on September 14, 2011, plaintiff was treated in the Emergency Department at CoxHealth South by Pat Gilbreth, M.D., for major depression with suicidal ideation with a plan to overdose. Plaintiff reported using bath salts and K2 (synthetic marijuana) heavily in the past years until approximately 3 weeks previous to this admission. Plaintiff denied the use of alcohol. Dr. Gilbreth reported that plaintiff appeared uncomfortable and was crying. Plaintiff was transferred to CoxNorth "until psychiatric placement is available." (Tr. 1110-1113, 1117-1119).

Plaintiff verbalized suicidal thoughts with a plan to overdose on pills and related feeling suicidal daily for months, worse today. Plaintiff admitted to using bath salts and K2 heavily the past few years. "[S]mokes one pack cigarettes per day, street drugs, K2 and bath salts x 1 year. Last dose three weeks ago." Plaintiff was transferred to Ozark Medical Center for further psychiatric care (Tr. 1114-1116, 1120-1122).

On September 24, 2011, plaintiff was treated by Jock Porter, M.D., in the Emergency Department at CoxHealth South for prescription medicine overdose-intentional and major depression with suicidal ideation. Plaintiff said she took a handful of pills including Wal-Mart sleeping pills, Requip (treats restless leg syndrome), Flexeril (muscle relaxer), Hydroxyzine (an antihistamine that treats anxiety), **Hydrocodone (narcotic), Darvocet (narcotic),** Imitrex (for migraine headaches), and Celexa (treats depression). Plaintiff presented with depression, agitation, and anxiety, and was combative and tearful. Plaintiff verbalized suicidal thoughts with plan to take an overdose of pills and reported access to lethal means. Plaintiff was admitted to the hospital for further treatment (Tr. 1124-1131).

On October 13, 2011, plaintiff went to the emergency room at CoxHealth South but left before she was assessed because she said she felt better (Tr. at 1132).

On October 18, 2011, plaintiff was treated by Tracy Kennetz, M.D., at CoxHealth South Emergency Department for complaints of chest pain. Plaintiff was given a GI cocktail (a mixture of medicines for stomach acid) with some resolution of neck and throat pain, but she continued to have chest pain. Cardiac testing was normal; chest x-rays were normal. A Nuclear Medicine stress study showed no evidence for ischemia[18] or infarction (heart attack) and normal left ventricular wall motion with LVEF of 57%.[19] Plaintiff's home medications were listed as Trazodone (treats depression), Requip (treats restless leg syndrome), Effexor (treats anxiety), **Tramadol (narcotic-like pain reliever)**, Imitrex (treats migraine headaches), and **Klonopin (treats anxiety and is a schedule IV controlled substance)** (Tr. 1138-1149).

On November 22, 2011, plaintiff was treated by Michael Galindo, M.D., at CoxHealth North Emergency Department for substance induced mood disorder. Plaintiff had been huffing spray paint about an hour before. Plaintiff was smoking a pack of cigarettes per day, she smokes marijuana, she had used methamphetamine 3 weeks ago, and she last used heroin a month ago. She was having suicidal thoughts and requested help with ceasing her huffing of spray paint and canned air. Plaintiff was admitted to the hospital for further psychiatric treatment (Tr. 1162-1169).

Twelve days later, on December 4, 2011, plaintiff was treated by Jacob Baltz, M.D., at CoxHealth South Emergency Department for head and chest contusion. "Me and my husband got into an altercation tonight and it became physical. I have a knot on my forehead and back. I was hit by his fists." Plaintiff reported smoking a pack of cigarettes per day and using alcohol

---

[18]Myocardial ischemia occurs when blood flow to the heart muscle is decreased by a partial or complete blockage of the heart's arteries (coronary arteries). The decrease in blood flow reduces the heart's oxygen supply

[19]Left ventricular ejection fraction (LVEF) is the measurement of how much blood is being pumped out of the left ventricle of the heart (the main pumping chamber) with each contraction. Normal is 55% to 75%.

on a daily basis. Chest x-rays showed no acute cardiopulmonary abnormality and a CT scan of her head showed only mild soft tissue swelling overlying the left frontal bone. There was no underlying fracture or intracranial hemorrhage. Plaintiff also had very minimal sinus disease. A social worker provided information to plaintiff, but she left the hospital with her family. Plaintiff was given prescriptions for Hydroxyzine (an antihistamine used to treat anxiety) and **Lortab (narcotic)** (Tr. 1171-1189).

The following day, on December 5, 2011, plaintiff returned to CoxHealth South Emergency Department and was treated by Joseph Cooper, M.D., for complaints of continued severe headache, blurry vision, and excessive sleepiness following previous treatment for head injury. CT scan was repeated with no significant change from the scan the day before. Plaintiff was prescribed **Percocet (narcotic)** and discharged to home. (Tr. 1190-1206).

One week later, on December 12, 2011, plaintiff was treated by Howard Jarvis, M.D., at CoxHealth South Emergency Department after complaining of migraine headache not relieved by Imitrex. Plaintiff denied using alcohol or street drugs. Plaintiff was observed to exhibit normal behavior. She denied any musculoskeletal pain. She was given an injection of Toradol (non-steroidal anti-inflammatory) and Benadryl (antihistamine) with resulting relief of her discomfort and was then discharged (Tr. 1207-1217).

One week later, on December 19, 2011, plaintiff was treated by Jonathan Boswell, PA, at Jordon Valley Community Health Center for complaints of back pain. Plaintiff reported that she last consumed an alcoholic drink on June 10, 2010 -- more than a year and a half ago. Yet 15 days ago she admitted to daily alcohol use in the CoxHealth South Emergency Room. Mr. Boswell noted that plaintiff was positive for back pain and neuro/psychiatric symptoms of obsessiveness and paranoia. Plaintiff was assessed with headache, depressive disorder not

elsewhere classified, restless leg syndrome, and displacement of lumbar intervertebral disc. It is unclear what treatment, if any, was provided. (Tr. 1086-1089).

On January 4, 2012, plaintiff went to CoxHealth South Emergency Department for treatment of a migraine headache but reported improvement in her discomfort and left without receiving treatment (Tr. 1218-1226, 1242).

Four days later, on January 8, 2012, plaintiff returned to CoxHealth South Emergency Department and was treated by Jerry Fenwick, M.D., for complaints of urinary tract infection and migraine headache. "Patient uses tobacco products, smokes one-half pack cigarettes per day, alcohol only on a social basis. The patient denies using street drugs, IV drugs." Plaintiff was observed to be quiet and cooperative. She was given injections of Zofran (prevents nausea and vomiting) and **Nubain (narcotic)**, and she was given prescriptions for Compazine (for nausea), **Lortab (narcotic)**, and Cipro (antibiotic) (Tr. 1229-1241).

The following day, on January 9, 2012, plaintiff returned to Physician's Assistant Boswell with complaints of migraine and nosebleed, and she requested treatment for Hepatitis C. Plaintiff had normal mood and affect.  Plaintiff was treated for sinus headache and given a Zithromax (antibiotic) prescription in addition to her other medications (Tr. 1090-1092).

Nine days later, on January 18, 2012, plaintiff was treated by Joseph Craigmyle, M.D., at CoxHealth South Emergency Department for complaints of migraine headache pain. Plaintiff reported one of her current home medications was **Lorcet, a narcotic.** She was noted to be cooperative and pleasant. Following two **Morphine (narcotic)** injections, her headache resolved and she was discharged (Tr. 1256-1265).

On March 1, 2012, plaintiff was treated by a provider (name illegible) at Ozarks Community Hospital Hepatitis C Clinic. The diagnosis was Hepatitis C with liver biopsy recommended (Tr. 1056).

Four days later, on March 5, 2012, plaintiff was treated by Mark Ross, M.D., at CoxHealth South Emergency Department for gastroesophageal reflux pain and discomfort. "Patient uses tobacco products, smokes one pack cigarettes per day, alcohol but reports only rare drinking." EKG was normal. Plaintiff was given Zofran (prevents nausea and vomiting). "While receiving discharge instructions, pt states, 'I have been in pain for 5 hours and you are discharging me in fucking pain!' I explained to her that I have talked to the doctor and he does not want pain medication ordered. I also reexplained the importance of taking the prescriptions that she was being discharged with. Pt continues to cuss and be disrespectful to staff. Pt discharged home with discharge instructions, refused to allow vital signs to be taken." Her discharge prescription was for Zantac, which controls stomach acid (Tr. 1266-1278).

Three days later, on March 8, 2012, plaintiff saw Jonathan Boswell, PA, at Jordon Valley Community Health Center for a refill of Flexeril (muscle relaxer). Plaintiff also reported that she was starting Hepatitis C treatment with Dr. Beene. (Tr. 1093-1094).

One week later, on March 15, 2012, plaintiff was treated by Dr. Joe Farley, M.D., at CoxHealth South Emergency Department for hypertension, hyperventilation syndrome, vomiting and generalized anxiety. She said she found out a week ago she is HIV positive. She was at Wal-Mart buying Zantac when she stopped to take her blood pressure. When she saw that it was high, she became very upset and anxious and started to hyperventilate. Emergency medical personnel were called and plaintiff was taken to the hospital by ambulance. EKG was normal. Plaintiff was given an injection of **Morphine (narcotic),** Zofran (prevents nausea and vomiting), and Clonidine (treats high blood pressure). She was given a prescription for Clonidine and told to follow up with her treating physician (Tr. 1058, 1279-1298).

One week later, on March 22, 2012, plaintiff was treated by Juliah Tiedemann, M.D., at CoxHealth North Emergency Department for substance-induced mood disorder. Plaintiff

requested detox for the use of "computer duster" inhalant which she last used that morning and had been using for six months. Plaintiff verbalized suicidal thoughts but had no plan. "Patient denies prior suicide attempt(s)." Plaintiff admitted to abusing drugs and inhalants. Plaintiff reported hearing voices and noises. Plaintiff related being more depressed and did not feel as though her medications were working. At one point she said she felt like she was having an anxiety attack with chest pain, and she was given hydroxyzine (also called Vistaril, an antihistamine that treats anxiety) orally. "Pain 0/10: Patient states her pain is gone 2 minutes after she took Vistaril, stating, 'Oh, it always does that.'" Plaintiff left the emergency room about three hours after she arrived (Tr. 1299-1307).

Eight days later, on March 30, 2012, Jonathan Boswell, PA, at Jordon Valley Community Health Center treated plaintiff for earache and listened to her request to see a psychiatrist. Mr. Boswell noted plaintiff's symptoms of anxiety, difficulty concentrating, and feelings of guilt, and recommended she have a regular psychiatrist. "The patient denies hopelessness, exhibits normal judgment, and does not have suicidal ideation. The patient demonstrates the appropriate mood and affect." Mr. Boswell diagnosed plaintiff with moderately severe depression and recommended counseling. (Tr. 1096-1098).

Six days later, on April 5, 2012, plaintiff was treated by Pat Gilbreth, M.D., at CoxHealth South Emergency Department, for right upper quadrant abdominal pain after undergoing a liver biopsy. She admitted smoking cigarettes but denied using alcohol or street drugs. A CT scan of the abdomen and pelvis showed trace blood consistent with recent biopsy. There was moderate hepatic steatosis (fatty liver), moderate hepatomegaly (swelling of the liver), hiatal hernia,[20] and mild left colon diverticulosis (see footnote 11, page 16). Plaintiff was

---

[20]Hiatal hernia is a condition in which part of the stomach sticks upward into the chest, through an opening in the diaphragm. The diaphragm is the sheet of muscle that separates the chest from the abdomen. It is used in breathing.

given **two shots of Morphine (narcotic)** and a prescription for Phenergan (for nausea) and discharged (Tr. 1308-1323).

On May 1, 2012, the second administrative hearing was held.

The remainder of the medical evidence was submitted by plaintiff to the Appeals Council as new and material evidence.

On May 10, 2012, plaintiff was treated at CoxHealth South Emergency Department by Gregory Hunter. M.D., for complaints of flank pain and abdominal pain. CT scan showed no evidence of hydronephrosis (water inside the kidney); a few calcific densities in the lower abdomen probably vascular; an ovarian cyst identified in April 2012 faintly present but appearing somewhat smaller; and no free fluid collection.[21] Plaintiff was given an injection of **Morphine (narcotic)**, Zofran (for nausea), and Toradol (non-steroidal anti-inflammatory) and discharged with a prescription for **Talwin (narcotic)** (Tr. 1413-1417).

Ten days later, on May 20, 2012, plaintiff was treated at CoxHealth South Emergency Department by Matt Brandt, M.D., for complaints of headache not relieved by two doses of Imitrex. She denied the use of alcohol or street drugs. Plaintiff was given an injection of Zofran (for nausea), Toradol (non-steroidal anti-inflammatory), and **Dilaudid (narcotic)**. Plaintiff's pain decreased and she was discharged with prescriptions for Flexeril (muscle relaxer) and **Vicodin (narcotic)** (Tr. 1418-1420).

The following day, on May 21, 2012, plaintiff was seen by Edward Skeins, M.D., at CoxHealth South Emergency Department by for treatment of headache relapse from the previous day. Plaintiff was given an injection **Dilaudid (narcotic)** and told to alert Dr. Beene

---

[21]Free fluid is actually accumulation of water or other fluid in the areas where it is not meant to be present. Every cell of body has extracellular and intracellular fluid. This is managed by balance of salts in and out of the body. Any differentiation in normal conditions or other medical problems could disbalance the fluid proportions and could cause water accumulation in several parts.

that she was experiencing worse headaches after Interferon treatment for Hepatitis C (Tr. 1421-1423).

Two days later, on May 23, 2012, plaintiff was treated by Joseph Craigmyle, M.D., at CoxHealth North Emergency Department for psychiatric problems. Plaintiff was caught by the police huffing from a dust removal can. Plaintiff said that she did not want help to stop huffing, that she had cut down from multiple times a day to once every two weeks. The resulting impression was substance abuse. Plaintiff was discharged with directions to follow up with her treating physician (Tr. 1424-1426).

The next day, on May 24, 2012, plaintiff was at CoxHealth South Emergency Department for complaints of a headache. She was given injections of **Ativan (treats anxiety and is a Schedule IV controlled substance)** and **Dilaudid (narcotic)**. Plaintiff was again instructed to talk to Dr. Beene about this apparent side effect of her Interferon treatment (Tr. 1427-1430).

Two days later, on May 26, 2012, plaintiff was treated at CoxHealth South Emergency Department for a headache and was given injections of **Demerol (narcotic)** and Hydroxyzine (an antihistamine that treats anxiety), and she was given a prescription for **Vicoprofen (narcotic)** (Tr. 1431-1433).

Two days later, on May 28, 2012, plaintiff was treated at CoxHealth South Emergency Department and requested a shot of Dilaudid, a narcotic. "'I really liked it when they gave me Dilaudid, my headache went right away, but came back even worse the next day, so I came back and got more, and my headache went right away, but came back even worse the next day.' Pt reports headache improves after each ER visit in which she receives narcotics, but headache comes back worse the next day." CT scans of her head were normal. Plaintiff was asked to discuss with Dr. Beene about continuing with the Interferon therapy for Hepatitis C

due to the apparent side effect of severe headaches she was experiencing. "Pt very angry, states 'all it would take is a shot of Dilaudid and my headache would get better'. Pt reinformed of her history of the week, and that every time she has gotten narcotics, the headache is worse the next day. Pt advised that there is no signs of a life threatening condition ongoing, and she needs rest and plan to follow up with pcp the next day." She was given an injection of **Ativan (treats anxiety and is a Schedule IV controlled substance)** and was given a prescription for **Percocet (narcotic)** (Tr. 1432-1438).

Three days later, on May 31, 2012, plaintiff was seen at CoxHealth South Emergency Department for a headache. She received an injection of **Ativan (treats anxiety and is a Schedule IV controlled substance)**, and **Percocet (narcotic)**, and was discharged (Tr. 1439-1442).

That same day, on May 31, 2012, plaintiff underwent an evaluation at Burrell Behavior Health conducted by Ms. Lisa Lorenzio, RN. Ms. Lorenzio noted signs of dishonesty and exaggeration when plaintiff was questioned about past history, treatment, symptoms, and diagnosis. The diagnosis after completing the evaluation was drug abuse (DSM-IV 305.90), major depressive disorder recurrent severe w/o psychotic feature (DSM-IV 296.33); schizoaffective disorder (DSM-IV 295.70); amphetamine or amphetamine-like induced mood disorder (DSM-IV 292.84); and bipolar disorder, not otherwise specified (DSM-IV 296.80). Ms. Lorenzio stated that plaintiff would benefit from meeting regularly with her CSS to gain access to available resources and begin working on treatment goals. It was noted that plaintiff had limited coping skills leading to frequent inpatient hospitalizations. Her GAF was estimated at 23[22] with suggested services including CSS visits up to several times a week, medication and

---

[22]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to

symptom management, individual and/or group therapy, PSR, and crisis services as needed (Tr. 1367-1393).

Three days after her last ER visit, on June 3, 2012, plaintiff was treated by Pat Gilbreth, M.D., at CoxHealth South Emergency Department for complaints of headache. Dr. Gilbreth wrote, "Pt becomes very angry with me for asking questions about the possibility of being addicted. She states she feels guilty about it, but states that if it takes illegal activity to obtain narcotics, she is willing to do that. I believe pt is addicted to narcotics, and these headaches are withdrawal headaches. . . . Pt states to me that the IV fluids, **Ativan [treats anxiety and is a Schedule IV controlled substance]** and Toradol [non-steroidal anti-inflammatory] did nothing for her headaches, not until she received **2 Percocet [narcotic]**, did her headache subside. Again, tried to have conversation with pt about her possible narcotic overuse, possible addiction, but pt gets so angry cursing at cussing at me." (Tr. at 1443-1445).

One week later, on June 10, 2012, plaintiff was treated by Douglas Ham, D.O., at CoxHealth South Emergency Department for complaints of headache. Plaintiff denied the use of alcohol, street drugs or IV drugs but admitted to the use of tobacco products. Plaintiff's home medications included Interferon injections every Thursday. Neurological examination results were within normal limits with the sole notation being headache. Plaintiff was given an injection of **Nubain (narcotic)**, **Morphine (narcotic)**, and **Ativan (treats anxiety and is a Schedule IV controlled substance)**. Plaintiff's pain decreased and she was discharged (Tr. 1446-1448).

Two days later, on June 12, 2012, plaintiff was treated by Samuel Alexander, M.D., at CoxHealth South for complaints of headache. Plaintiff received an injection of **Nubain (narcotic)** and was discharged (Tr. 1449-1451).

---

function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

The following day, June 13, 2012, plaintiff went to the emergency room at CoxHealth South but left before medical screening was done (Tr. at 1452-1453).

Four days later, on June 17, 2012, plaintiff was treated by David Lee, M.D., at CoxHealth South for complaints of headache. No changed in her home medications was noted. Plaintiff reported smoking ½ pack of cigarettes per day. An injection of **Morphine (narcotic)** was given. Plaintiff's pain decreased and she was discharged with a prescription for Imitrex (Tr. 1454-1456).

The following day, on June 18, 2012, plaintiff was treated by Fred Dutton, M.D., at CoxHealth North Emergency Department for complaints of slow progression of psychiatric problem and headache. Plaintiff presented with agitated behavior including homicidal behavior noted. The symptoms began three months ago. Plaintiff denied abdominal pain, anxiety, chest pain, delusions, depression, hallucinations, headache (even though this is listed as one of the reasons for this ER visit), nausea, paranoia, shortness of breath, substance abuse, and suicidal ideation. Plaintiff's behavior and mood were anxious and aggressive. Plaintiff's affect was animated. Plaintiff was oriented to person, place, and time, but had thoughts of homicide. Plaintiff denied pain. Plaintiff was given an injection of Imitrex (for headache) and Toradol (non-steroidal anti-inflammatory) plus a dose of Maalox Plus for stomach acid. Dr. Dutton's assessment was chronic pain symptoms and agitation. Plaintiff was discharged to home (Tr. 1457-1459).

Four days later, on June 22, 2012, plaintiff was seen by Juliah Tiedermann, M.D., at CoxHealth South Emergency Department for a refill of Vicoprofen (narcotic) due to chronic back pain. She said she was recently seen by a physician who prescribed Tylenol #3 (narcotic) but she cannot take Tylenol because of her liver. Plaintiff was described as calm and cooperative. The doctor's examination showed plaintiff's back was positive for pain with

movement. The doctor noted plaintiff's history of IV drug use and substance abuse, and declined to prescribe Vicoprofen. Plaintiff was discharged and given prescriptions for Naprosyn (non-steroidal anti-inflammatory), Medrol (steroid), and Zantac (treats GERD) (Tr. 1460-1461).

Four days later, on June 26, 2012, plaintiff was treated by Gregory Hunter, M.D., at CoxHealth South Emergency Department for complaints of chest pain. Dr. Hunter's exam was positive for abdominal pain and diarrhea. Plaintiff was given an injection of **Morphine (narcotic)** and **Fentanyl (narcotic)**. (Tr. 1462- 1465).

Two days later, on June 27, 2012, plaintiff was treated by Richard Swinney, M.D., at CoxHealth South Emergency Department for complaints of headache. Dr. Swinney noted plaintiff's many recent emergency room visits for headache with administration of numerous doses of opiate based pain medications including Morphine, Percocet, and Nubain, as well as Imitrex, Toradol, Ativan, Benadryl, and Phenergan, etc., and requests for refill of narcotic pain medication.

> When asked if she had been seen anywhere for any reason in the last 30 days, she mentioned the name of one other physician, but her mother (usually in attendance) mentioned her previous evaluations. When the patient mentioned not being able to take Phenergan [treats nausea] due to restless leg syndrome, I asked if she had any problem with it when she had received it on 13 June or 17 June. Patient indicated that she had not had any noticeable change in her RLS after either of those doses. Patient indicates that she will be seeing a new doctor 3 July as her current PMD Dr. Stinson is not addressing her pain to her satisfaction.

Dr. Swinney noted plaintiff appeared anxious. Plaintiff's neurological examination was within normal limits. His diagnosis was headache-chronic; and frequent emergency room visits. Plaintiff was given an injection of Toradol (non-steroidal anti-inflammatory) and Phenergan (for nausea) and was discharged with a prescription for Phenergan suppositories (Tr. 1468-1471).

Three days later, on June 30, 2012, plaintiff was treated by Michael Galindo, D.O., at CoxHealth South Emergency Department for complaints of headache. Dr. Galindo noted plaintiff's extensive medical history with red flags for headache. Plaintiff indicated that this was typical for her and refused further evaluation for her headache. Plaintiff was given an injection of **Morphine (narcotic)** and discharged with a prescription for **Percocet (narcotic)** (Tr. 1472-1474).

Two days later, on July 2, 2012, plaintiff was treated by Dennis Kenyon, M.D., at CoxHealth South Emergency Department.  Plaintiff said she though she had a reaction to Haldol (treats schizophrenia) as she was experiencing slurred speech and trouble walking. She took Benadryl and her symptoms subsided but then she got a migraine. Dr. Kenyon observed that plaintiff's gait was normal. He gave her an injection of **Ativan (treats anxiety and is a Schedule IV controlled substance)** and Toradol (non-steroidal anti-inflammatory). Plaintiff was discharged with prescriptions for Zofran (treats nausea), **Vicoprofen (narcotic)**, and **Ativan (treats anxiety and is a Schedule IV controlled substance)** (Tr. 1475-1478).

The next day, on July 3, 2012, plaintiff was treated by Fred Dutton, M.D., at CoxHealth South Emergency Department for complaints of injury received when assaulted. Plaintiff sustained injury to the head and low back. Plaintiff had mild tenderness of the forehead, right eye, lumbar area, left mid back pain, and right mid back. X-rays of plaintiff facial bones and lumbar spine showed no acute fraction with stable degenerative changes of lumbar spine. Plaintiff was offered Tylenol but refused (Tr. 1479-1483).

The following day, on July 4, 2012, plaintiff was treated by Cami Porter, M.D., at CoxHealth South Emergency Department for complaints of overdose after being found sitting at the end of her road with a glow stick, can of gas, "pump it," and vehicle registration paperwork. Plaintiff was combative and uncooperative with exam, "spitting, biting, fighting."

Possible causes noted were drug use and "pump it" bath salts. Chest x-ray was normal. Plaintiff was given injections of Haldol (treats schizophrenia) and **Ativan (treats anxiety and is a Schedule IV controlled substance)** and discharged for admittance for 96-hour hold (Tr. 1484-1489).

From July 5, 2012, through July 7, 2012, plaintiff was involuntarily admitted to Freeman Health System for overdose and suicidal ideations. Alok Jain, M.D., evaluated plaintiff and noted her urine drug screen was positive for benzodiazepines (Ativan, administered in the ER on July 4, 2012, is a benzodiazepine). The doctor noted that plaintiff has had multiple psychiatric hospitalizations and has an extensive history of polysubstance dependence. Dr. Jain indicated that plaintiff was confused and not a reliable historian. Plaintiff's insight and judgment were impaired. The doctor estimated that plaintiff's intelligence was probably average although difficult to assess because of her confusion. Plaintiff denied wanting to harm herself. Dr. Jain's diagnosis was polysubstance induced mood disorder, polysubstance dependence specifically bath salts. Plaintiff's GAF upon admission was 25.

During this admission, plaintiff was also treated by Steven Goad, M.D. Dr. Goad noted the reports that plaintiff was using bath salts and was psychotic, which plaintiff denied. Psychological and cognitive testing was done and revealed significant deficits suggesting that plaintiff was not able to take care of herself in a reasonable way. Although a SIRS exam revealed a declaration that was strongly characteristic of someone feigning psychosis and that her symptoms are highly unusual and not consistent with genuine patients, Dr. Goad opined that plaintiff was not deliberately feigning psychosis but was presenting things in a manner consistent with her cognitive testing. Plaintiff's substance abuse history was extensive and included many years of huffing and IV drugs of various types including methamphetamines. Plaintiff's medications at discharge were Keflex (antibiotic) and Effexor (treats depression). The

suggestion was that guardianship for plaintiff would be a good idea. Plaintiff's discharge diagnoses were dementia secondary to substance abuse, polysubstance dependence, and chronic adjustment disorder with a GAF of 45[23] (Tr. 1325-1358, 1490-1506).

A week after her discharge, on July 14, 2012, plaintiff was treated by Michael Galindo, D.O., at CoxHealth South Emergency Department for complaints of headache. Plaintiff denied the use of alcohol and IV drugs. Plaintiff was given an injection of **Morphine (narcotic)** and discharged with a prescription for **Percocet (narcotic)** (Tr. 1506-1508).

The next day, on July 15, 2012, plaintiff was treated by Matt Loutzenhiser, , M.D., at CoxHealth Urgent Care Center for complaints of headache and high blood pressure. Plaintiff's mood and affect were within normal limits. Plaintiff was given of **two injections of Morphine (narcotic)** along with Toradol (non-steroidal anti-inflammatory), Labetalol (treats high blood pressure), and Zofran (for nausea) and discharged with a prescription for Clonidine (treats high blood pressure) (Tr. 1509-1515).

On July 27, 2012, plaintiff was treated by Jamie Jones, M.D., for complaints of headache. Plaintiff indicated to the doctor that morphine is the only medication that works to relieve her discomfort. Plaintiff was given an injection of **Morphine (narcotic).** (Tr. 1516-1518).

Three days later, on July 30, 2012, plaintiff was treated by David Showers, D.O., for complaints of headache and chest pain described as sharp and stabbing. Plaintiff's behavior and mood were within normal limits. Plaintiff's cardiovascular and neurological exam findings were normal. Plaintiff was given an injection of Toradol (non-steroidal anti-inflammatory) and discharged with a diagnosis of costochondritis (inflammation of a rib or the cartilage

---

[23]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

connecting a rib) and recurrent migraine headache, and was given a prescription for Naprosyn (non-steroidal anti-inflammatory) (Tr. 1519-1521, 1525).

Two days later, on August 1, 2012, plaintiff was treated by John Washburn, M.D., for complaints of headache not relieved by prescription Maxalt. Plaintiff's exam was normal. No medications were administered. Plaintiff was discharged with a prescription for **Fioricet (treats tension headaches and is a Schedule III controlled substance)** (Tr. 1522-1524).

Five days later, on August 6, 2012, plaintiff was treated by Rachael Winston, M.D., at CoxHealth Urgent Care for complaints of headache. Plaintiff refused an injection of Imitrex and Toradol. Plaintiff demanded "strong narcotics" and when other treatments were offered, plaintiff "became angry" and left the treatment area. (Tr. 1526-1529). Plaintiff immediately went to Ozarks Community Hospital Medicaid Clinic and reported that she had been treated at the urgent care center for blood pressure and nausea but her headache had escalated. Plaintiff was given an injection of Toradol and Phenergan and prescribed Inderal for the headache. Plaintiff was told that her use of cigarettes makes migraines worse, to which she stated, "I know, I know." Plaintiff also stated that, "Narcotics usually help. I should have just gone to the ER, at least they will give me the morphine." Plaintiff was told that narcotics "will not help but mask it for a short period." (Tr. 1360-1362).

On August 11, 2012, plaintiff was treated by Rachael Winston, M.D., at CoxHealth Urgent Care for complaints of left lower quadrant pain with movement. The diagnosis was muscle spasm/strain. Plaintiff was discharged with a prescription for Flexeril (muscle relaxer) (Tr. 1530-1532).

On August 23, 2012, plaintiff was treated by Edward Skeins, M.D., at CoxHealth South for complaints of neck and back stiffness after a fall in the bath tub the day before. Plaintiff had mild back pain with decreased range of motion with all movement. Cervical spine x-rays were

negative. Lumbar spine x-rays showed only mild degenerative facet changes in the lower lumbar spine with no changes since the x-rays of July 3, 2012. Plaintiff was given **Norco (narcotic)** with **Hydrocodone (narcotic)** and Acetaminophen with decrease in her pain noted. The assessment was cervical and lumbar strains, and Dr. Skeins recommended she take **Tramadol (narcotic-like pain reliever)** for pain (Tr. at 1533-1537).

That same day plaintiff saw neurologist Kenneth Sharlin, M.D., after having been referred by Dr. Beene for complaints of frequent migraine headaches. Plaintiff reported that she had recently started taking Topamax, Propranolol and magnesium supplementation and that this protocol had improved the frequency of her migraines. Plaintiff reported that "in the past couple of weeks she has not gone [to the ER] at all." Plaintiff told Dr. Sharlin that she had "a prior history of head injury and was in a coma for three days." A mental status exam was normal. Dr. Sharlin adjusted the dosage of Verapamil (treats high blood pressure) and recommended follow up (Tr. 1363-1364).

One week later, on August 30, 2012, plaintiff was treated at Ozarks Community Hospital Medicaid Clinic for complaints of right knee pain. The impression was osteoarthritis, tobacco abuse, possible right meniscal tear, and right knee edema. Ibuprofen and Tylenol were prescribed with MRI of knee recommended. Smoking cessation was highly stressed (Tr. 1395-1396).

Six days later, on September 5, 2012, plaintiff was treated at Ozarks Community Hospital Medical Clinic for complaints of migraine headache. Plaintiff said she was in drug-abuse treatment at CSTAR[24] and had been in that program for three weeks (although I note

---

[24]"Developed by DBH [Division of Behavioral Health, formerly the Divisions of Alcohol and Drug Abuse and Comprehensive Psychiatric Services] and funded by Missouri's Medicaid program and DBH's purchase-of-service system, the Comprehensive Substance Treatment and Rehabilitation (CSTAR) Program also provides a full continuum of care approach to substance abuse treatment. CSTAR offers a flexible combination of clinical and supportive services, to

plaintiff was treated with narcotics during that three-week period). Plaintiff was given an injection of Toradol and Phenergan. Smoking cessation was urged (Tr. 1397-1398).

Later that same day plaintiff was treated by Dr. Rachael Winston at CoxHealth Urgent Care for complaints of headache. Plaintiff reported brief improvement after the Toradol and Phenergan given her earlier in the day but that her headache had returned. Dr. Winston noted plaintiff's many presentations for migraine treatment and her demand in the past for narcotics. Plaintiff was given Imitrex and an injection of Norflex (muscle relaxer) with decrease in her pain. Plaintiff was discharged with prescriptions for Norflex and Zofran (treats nausea) (Tr. 1538-1540).

On September 24, 2012, plaintiff underwent psychiatric evaluation conducted by D. Paul Dobard, M.D., at the request of Dr. Beene. Dr. Dobard reported that plaintiff's affect appeared restricted and she appeared somewhat angry. Plaintiff's insight and judgment were fair and her IQ appeared to be average. There was evidence of psychotic symptoms, mainly auditory hallucinations and paranoia. Plaintiff's memory was intact. Her medications were listed as Seroquel (treats schizophrenia) (this was a new medication prescribed that day by Dr. Dobard), Trileptal (treats anxiety), Maxalt (treats migraine headaches), Requip (treats restless leg syndrome), Cyclobenzaprine (muscle relaxer), Haloperidol (treats schizophrenia) (at Dr. Dobard's direction, plaintiff was to begin tapering off), **Tramadol (narcotic-like pain reliever),** Propranolol (treats high blood pressure), Trazodone (treats depression and insomnia), Verapamil (treats high blood pressure), Effexor (treats depression), and Topamax (prevents migraine headaches). Dr. Dobard's diagnoses of her mental impairments were Schizoaffective

include temporary living arrangements when appropriate, that vary in duration and intensity depending on the needs of the consumer." http://dmh.mo.gov/ada/progs/treatment.htm

disorder, likely bipolar type, and history of substance abuse. He assessed a GAF of 60[25] (Tr. 1399-1400).

Five days later, on September 29, 2012, plaintiff was treated by Tommy Trent, D.O., at CoxHealth South Emergency Department. Plaintiff was brought to the ER by EMS as she was caught huffing canned air. Psychiatric exam showed her to be alert, oriented to person, place, and time, and her behavior, mood, and affect all fell within normal limits. Clonidine was administered for high blood pressure. Plaintiff's anxiety decreased. Dr. Trent's diagnosis was alcohol and drug abuse and hypertension. Plaintiff was discharged with follow up recommended (Tr. 1541-1544).

Three days later, on October 2, 2012, plaintiff was treated at Ozarks Community Hospital Medicaid Clinic for pain medication refill for right knee pain. Examination showed her right knee was tender. Plaintiff was prescribed **Tramadol (narcotic-like pain reliever)**, and she requested help with smoking cessation including Nicoderm (Tr. 1401-1402).

On October 22, 2012, plaintiff was treated by John Washburn, M.D., at CoxHealth Urgent Care for complaints of knee pain. Plaintiff could partially bear weight with assistance. Plaintiff's musculoskeletal exam was positive for decreased range of motion, pain, and tenderness of right knee. Plaintiff was referred to CoxHealth South for a higher level of care (Tr. 1550-1552).

Later that day plaintiff was treated by Mark Ross, M.D., at CoxHealth South Emergency Department for complaints of chronic knee pain. Plaintiff had tenderness in the posterior aspect of the right knee. Right lower extremity venous duplex ultrasound showed no evidence

---

[25]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

of acute or chronic blood clots. No medications were administered. The diagnosis was knee pain (Tr. 1548-1549, 1553).

Three days later, on October 25, 2012, plaintiff returned to Ozarks Community Hospital Medicaid Clinic with complaints of left shoulder pain. Plaintiff had a tender pressure point on the AC joint on examination. Plaintiff's right knee pain continued and the knee was tender. Plaintiff was given a steroid injection into the shoulder and right knee (Tr. 1403-1404).

On November 8, 2012, plaintiff was treated by Samuel Alexander, M.D., at CoxHealth South Emergency Department for complaints of back pain. Plaintiff presented with pain, spasm and tightness of the lumbar area. Range of motion was painful with all movement. Muscle spasm was noted. Straight leg raises did not illicit pain. Plaintiff reported that this condition began when bending over lifting boxes. Plaintiff admitted to smoking ½ pack of cigarettes per day but denied using alcohol and street drugs. The diagnosis was sprain and myofascial lumbosacral strain. Plaintiff was given an injection of Phenergan (for nausea) and **Demerol (narcotic)**. Plaintiff's pain decreased and she was discharged with prescriptions for Flexeril (muscle relaxer) and **Vicodin (narcotic)** (Tr. 1554-1556).

Four days later, on November 12, 2012, plaintiff was treated at Ozarks Community Hospital Medicaid Clinic for continued right knee pain despite the previous injection. Plaintiff reported the knee continued to be painful and she had a constant sharp pain when walking. Plaintiff also complained that her "back went out" the previous Thursday and despite being given **Demerol (narcotic)** and a prescription for **Vicodin (narcotic)** and Flexeril (muscle relaxer) at the Emergency Room, she continued to have pain. The clinician found a negative straight leg test but plaintiff's right knee was still tender. The assessment was lumbago (low back pain), tobacco abuse, right knee pain, and GERD. Prescriptions for Pepcid (treats GERD),

Celebrex (non-steroidal anti-inflammatory), Chantix (aids in smoking cessation), and **Tramadol (narcotic-like pain reliever)** were given (Tr. 1405-1408).

On November 26, 2012, plaintiff was examined by D. Paul Dobard, M.D., of Ozarks Community Hospital Behavioral Health. Dr. Dobard reported that plaintiff had a fixed, intense, psychotic component to her illness at this point; and it was being only minimally treated with her medications. Plaintiff told the doctor that her husband is Jesus Christ, and upon further exploration the doctor opined that she truly believed this. The mental status examination showed plaintiff was alert and oriented times three with fair grooming and variable eye contact. Plaintiff's speech was fairly normal in rate and rhythm. Her affect was somewhat less restricted. Plaintiff was less angry than during her first visit, and her insight and judgment were fair. Plaintiff was not suicidal or homicidal. Her IQ appeared to be average. Plaintiff was having some delusional thought processes. Dr. Dobard's diagnosis was schizoaffective disorder, likely bipolar type, and history of polysubstance abuse. The doctor increased plaintiff's dosage of Seroquel (treats schizophrenia) and Trileptal (treats seizures caused by epilepsy), and he continued her dosage of Effexor (treats depression and anxiety) and BuSpar (treats anxiety) (Tr. at 1409).

On November 30, 2012, the ALJ denied plaintiff's application for disability benefits after reconsideration.

On December 15, 2012, plaintiff was treated by Jess Lyon, D.O., at CoxHealth Urgent Care for complaints of chest pain and "face drawn up." Plaintiff was given a baby aspirin. Her cardiovascular and lung examinations were within normal limits. Plaintiff was transferred to CoxHealth for further care (Tr. 1562-1563). There plaintiff was treated by Robert Kensel, M.D., and Shawn Usery, M.D. Dr. Kensel described plaintiff as "an ER abuser with 4 visits per month." The examination showed an obese, anxious female in no acute distress. Facial

tightness was her chief complaint, and chest pain was more of an afterthought. Plaintiff had mild chest wall tenderness to palpation. Plaintiff indicated she had given up the use of bath salts and was involved with CSTAR and Transitions as recovery programs. Plaintiff was given an injection of **Ativan (treats anxiety and is a Schedule IV controlled substance)** and **Fentanyl (narcotic)**, and an oral dose of **Hydrocodone-acetaminophen (narcotic)**. The diagnosis was anxiety reaction and chest wall pain. Radiology reports for chest, heart, and lung exams were normal. Dr. Usery's discharge diagnoses were chest pain, likely not cardiac; bipolar disorder; depression; schizophrenia; Hepatitis C; history of migraines; and knee pain. (Tr. 1557-1561, 1565-1572).

Two days later, on December 17, 2012, plaintiff was seen by D. Paul Dobard, M.D., of Ozarks Community Hospital Behavioral Health. Plaintiff reported that she had been in the emergency room over the weekend but said she was there for elevated blood pressure and gastric distress -- she did not inform Dr. Dobard that she had been given Ativan, Fentanyl and Hydrocodone. The doctor noted that plaintiff no longer seemed fixated on believing that her husband is Jesus Christ. However, plaintiff's grooming was poor, eye contact variable, and her speech more rapid and louder than usual. The doctor indicated plaintiff appeared pleasant towards him but angry about a situation involving her daughter. Plaintiff appeared quite anxious. Plaintiff's insight and judgment were fair. Delusional thought content was present but not as intense as three weeks earlier. Dr. Dobard's diagnosis was schizoaffective disorder, likely bipolar type; history of polysubstance abuse in remission, currently in active treatment; and generalized anxiety disorder. The doctor increased the dosage of Seroquel, continued Effexor, BuSpar, and Trileptal, and added **Klonopin (treats anxiety and is a Schedule IV controlled substance)** (Tr. 1410-1411).

## C.     *SUMMARY OF TESTIMONY*

During the November 25, 2009, hearing, plaintiff testified as follows:

Plaintiff was then 36 years old, had a 12th-grade education, and generally worked as a waitress (Tr. 61). Plaintiff identified her then-current employers as Hobby Lobby and Dollar Tree (Tr. 61). Plaintiff characterized her work as a stocker, and between the two jobs she worked about 30 hours a week (Tr. 63).

Plaintiff testified that she missed a lot of work (e.g., one day every two weeks), because of pain and other complaints (Tr. 63-64). When pressed by counsel, plaintiff said that she missed between four and five days a month, or about 25 percent of her shifts (Tr. 64-65). Plaintiff also reported that she had to leave her work early 25 to 30 percent of the time due to illness (Tr. 67). Plaintiff explained that her employers tolerate her absenteeism and make special accommodations (Tr. 65-66, 68).

As to physical problems, plaintiff testified that she had Hepatitis C, and therefore her immune system was "totally shot" (Tr. 68). Plaintiff indicated that her medical providers wanted her to take shots as a cure, but the medication made her vomit so she discontinued it (Tr. 68-69).

As to physical limitations, plaintiff testified that she could lift and carry 10 pounds occasionally or frequently (Tr. 69-70), and she could lift about 15 pounds occasionally (Tr. 71).

Plaintiff testified that she could stand and walk up to three hours (Tr. 72). When pressed by counsel, plaintiff testified that she could stand without sitting for only 20 minutes (Tr. 72). In explaining the discrepancy in her numbers, plaintiff testified that during her day at Hobby Lobby, she takes a break every three hours (Tr. 72).  Plaintiff can walk around the block once before having to take a 20-30 minute break (Tr. 73).

Plaintiff can sit for about an hour (Tr. 74). Again, when pressed by counsel, plaintiff said that she needs to stand for a little bit for about 10 minutes because of problems with her leg (Tr. 74). In explanation of this apparent contradiction in her testimony, plaintiff and counsel had the following exchange:

Q.     So you weren't able to go for the hour?

A.     I guess not. (Tr. 74).

Plaintiff then testified that she could continually sit for up to 45 minutes (Tr. 74-75).

As to bending, stooping, crouching, kneeling, and crawling, plaintiff testified that she has difficulty with all of them and would be unable to perform those tasks up to a third of her day, five days a week (Tr. 75).

Plaintiff testified that she does not lie down during the day on a regular basis, but later indicated that she does lie down three or four times a week for about an hour to relax (Tr. 76-77).

As to her mental problems, plaintiff testified that she has been treated for bipolar disorder and paranoid schizophrenia (Tr. 77-78). Plaintiff testified that she takes Celexa and Abilify for her mental conditions (Tr. 79).

Plaintiff testified that she was then on Medicaid (Tr. 80).

Plaintiff reported problems sleeping (Tr. 81). She takes Lunesta for that problem but it has been ineffective (Tr. 81).

Plaintiff testified that her physical pain is her biggest problem (Tr. 82).

Plaintiff indicated that she has problems with her memory (Tr. 82). She also reported problems with focus and attention, stating, "It's, it's selective. It's whether I'm interested or not that it's going to -- whether it's going to attract my attention or not." (Tr. 83).

Plaintiff initially testified that she could concentrate for two hours without interruption, and then had the following exchange with counsel:

Q.      Could you do one hour for sure?

A.      Yes.

Q.      But you don't know about two?

A.      No.

Q.      Could you do more than two hours?

A.      Probably not. Depends on what it is about.

Q.      So, let's talk about this two hours. Does that mean you have good and bad days?

A.      Yes.

Q.      On a good day, could you do the two hours?

A.      Yes.

Q.      On a bad day, it would be less than that?

A.      Probably. (Tr. 84).

Plaintiff testified that she does the shopping and has no problem getting her purchases out of the store (Tr. 87-88). Plaintiff said that she does not require a break when doing her shopping, and she pushes the cart around (Tr. 88). In response to counsel's leading question, "Do you use it for support?", plaintiff answered, "Yes" (Tr. 88).

As to chores around the house, plaintiff testified that she and her daughter share the responsibilities for cleaning, dusting, vacuuming, washing dishes, and taking out the trash (Tr. 89). Plaintiff reported that she is unable to do this work when her back is out (Tr. 89). Counsel and plaintiff then engaged in the following exchange:

Q.      Okay. So I guess I'm confused about how you're doing these chores without any difficulty.

A.     Because I still have to do them I have no choice. I --

Q.     Okay.

A.     -- I have to take out the trash. I have to do my dishes. I have no choice.

Q.     Well, I'm --

A.     I'm in pain all the time --

Q.     Well, now that's what I was getting at. So, you are in pain while you're doing it?

A.     Yes. (Tr. 89-90).

As to other activities, plaintiff testified that she volunteers at a neighborhood park where dinner is served once every two weeks, and she helps arrange the place settings and opens up folding chairs (Tr. 91).

During the May 1, 2012, hearing, plaintiff testified as follows:

Plaintiff was then 5' 1" tall and weighed 214 pounds (Tr. 99). She does not drive because she lost her license a year earlier due to a DUI (Tr. 99). Plaintiff has a GED (Tr. 100). She experiences symptoms from schizophrenia despite her medication (Tr. 100-101).

Plaintiff testified that she had not worked since her amended onset date of June 1, 2011 (Tr. 102). She is unable to work due to her diagnosed bipolar disorder (Tr. 102). She can comfortably lift a basket of clothes, can walk a block with a break, cannot stand "very long," can sit without limits, cannot bend or squat, and has troubles with her hands going numb (Tr. 103-104).

Plaintiff experiences pain often (Tr. 104). She has trouble completing tasks (Tr. 105). She experiences panic attacks when she is around a large group of people (e.g., 4 to 5 people). A typical day for plaintiff involves sleeping, watching a little television, and perhaps doing some laundry (Tr. 108-109).

Plaintiff last used illicit drugs in June of 2011 when she ended up in the hospital (Tr. 109).

## V. *FINDINGS OF THE ALJ*

The ALJ issued a decision following the five-step sequential evaluation process called for in Social Security Regulations 20 C.F.R. 404.1520(a) and 416.920(a). This process was summarized by the ALJ in the text of his decision (Tr. 14-15).

The ALJ concluded that plaintiff meets the insured status requirement of the Social Security Act through September 30, 2015 (Tr. 15-16, 319).

At Step One, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since June 1, 2011, the amended alleged onset date (Tr. 16).

At Step Two, the ALJ concluded that plaintiff had the following severe impairments: obesity; Hepatitis C; migraine headaches; bilateral thumb arthritis, bilateral shoulder pain and mild lumbar spondylosis; and mental disorders variously described as psychiatric disorder not otherwise specified, history of dementia secondary to substance abuse, polysubstance dependence, and chronic adjustment disorder (Tr. 16). Plaintiff's allegation of a history of kidney stones and carpal tunnel syndrome were found to be nonsevere impairments. At the hearing, plaintiff alleged a new impairment of human immunodeficiency virus ("HIV"). However, the ALJ found this alleged HIV was not a medically determinable impairment. The judge found plaintiff's allegations of a history of stroke and heart attack were also not medically determination impairments (Tr. 16).

At Step Three, the ALJ concluded plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1 (20 C.F.R 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925 and 416.926) (Tr. 17).

At Step Four, the ALJ concluded that plaintiff "ha[d] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she [could] stand and/or walk no more than 2 hours in an 8 hour day; she [could] perform no more than occasional squatting, and no kneeling; she [could] perform simple tasks and instructions only; she [could] have no more than occasional interaction with the public, coworkers, and supervisors; and she lack[ed] the ability on a sustained basis to maintain persistence and pace on assigned work tasks throughout an 8 hour day." (Tr. 18). The ALJ concluded that plaintiff was unable to perform any past relevant work. (20 CFR 404.1565 and 416.965) (Tr. 22).

At Step Five, the ALJ concluded that plaintiff's acquired job skills did not transfer to other occupations within the residual functional capacity defined above. (20 CFR 404.1568 and 416.968) (Tr. 22). Based on plaintiff's age (then 38), on the amended alleged onset date, plaintiff's high school education and ability to communicate in English, and plaintiff's residual functional capacity based on all of the impairments, including the substance abuse disorders, there were no jobs in significant numbers in the national economy that plaintiff could perform. (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966) (Tr. 22).

The ALJ concluded that, considering all of plaintiff's impairments, including the substance use disorders, plaintiff was unable to make a successful vocational adjustment to work that exists in significant numbers in the national economy. A finding of "disabled" was, therefore, appropriate. (Tr. 23).

Returning to Step Two of the process, the ALJ concluded that if plaintiff stopped the substance use, the remaining limitations would cause more than a minimal impact on her ability to perform basic work activities; therefore, plaintiff would continue to have a severe impairment or combination of impairments (Tr. 23).

Returning to Step Three, the ALJ concluded that if plaintiff stopped the substance use, plaintiff would not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1 (20 C.F.R 404.1520(d), and 416.920(d) (Tr. 23).

Returning to Step Four, the ALJ concluded that if plaintiff stopped the substance use, she would have the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she could stand and/or walk no more than 2 hours in an 8 hour day; she could perform no more than occasional squatting and no kneeling; she could perform simple tasks and follow instructions; and she could have no more than occasional interaction with the public, coworkers, and supervisors (Tr. 25). The ALJ concluded that if plaintiff stopped the substance use, plaintiff would continue to be unable to perform her past relevant work (20 CFR 404.1565 and 416.965) (Tr. 30).

Returning to Step Five, the ALJ concluded that transferability of job skills were not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was "not disabled whether or not plaintiff had transferable job skills" (See Social Security Ruling 82-41 (SSR 82-41) and 20 CFR 404, Subpart P, Appendix 2) (Tr. 30). The ALJ concluded that if plaintiff stopped the substance use, she would be capable of making a successful adjustment to work that existed in significant numbers in the national economy. A finding of "not disabled" was, therefore, appropriate under the framework of Medical Vocational Rule 202.21. (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966) (Tr. 30- 31).

The ALJ concluded that the substance-use disorder was a contributing factor material to the determination of disability because plaintiff would not be disabled if she stopped the substance use. (20 CFR 404.1520(g), 404.1535, 416.920(g) and 416.935). Because the

substance-use disorder was a contributing factor material of the determination of disability, plaintiff had not been under a disability as defined in the Social Security Act from the amended alleged onset date June 1, 2011, through the date of the ALJ's decision on November 30, 2012 (20 CFR 404.1520(f) and 416.920(f)) (Tr. 31).

## VI. ARGUMENT

Plaintiff raises three issues on appeal:

- ▸ Whether the ALJ relied on proper medical evidence in determining that plaintiff's substance-use disorders were a contributing factor material to a determination of disability?

- ▸ Whether the ALJ erred in weighing the opinion evidence in the record?

- ▸ Whether the Appeals Council erred by not remanding the case for further proceedings to consider additional evidence submitted for review?

## A. SUBSTANCE-USE DISORDERS MATERIAL TO A DETERMINATION OF DISABILITY

A plaintiff is not disabled if a substance-use disorder is a contributing factor material to the ALJ's determination of disability. 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J). In determining whether a substance-use disorder is material, an ALJ must determine whether the plaintiff would still be disabled if he or she stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535 and 416.935. The plaintiff has the burden of proving disability during the materiality analysis. Social Security Ruling (SSR) 13-2p.

In deciding materiality, an ALJ must first determine whether the plaintiff is disabled considering all the limitations, including those caused by substance use. 20 C.F.R. §§ 404.1535(a) and 416.935(a). If disabled, the ALJ must then decide which of the limitations would remain if plaintiff were to stop using drugs or alcohol, and whether the remaining limitations would be disabling. 20 C.F.R. §§ 404.1535(b)(2) and 416.935(b)(2).

When deciding substance-use issues, an ALJ evaluates a plaintiff's credibility in the same manner as any other case. SSR 13-2p. Credibility determinations are left to the ALJ. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006).

Here, the medical record is replete with references to the plaintiff's illicit drug use and her drug-seeking behavior. As to plaintiff's use of street drugs, the record reveals the following:

- On September 16, 2008, plaintiff reported that she shot up methamphetamine one month earlier (Tr. 624-631);

- On May 7, 2009, plaintiff reported that she was then drug-free (Tr. 707-719, 803-808);

- On July 10, 2010, plaintiff, while being treated for an overdose, reported that she had not used street drugs in three years (Tr. 958-961);

- On March 22, 2011, plaintiff was advised by her doctor to stop using a legal form of methamphetamine (Tr. 990-1008);

- On April 5, 2011, plaintiff was diagnosed as abusing bath salts (Tr. 1009-1023);

- On June 21, 2011, plaintiff, after being admitted to the hospital, was diagnosed as abusing bath salts (Tr. 1030-1046);

- On November 22, 2011, plaintiff reported using methamphetamine three weeks earlier, heroin one month earlier, and was then huffing spray paint and canned air (Tr. 1162-1169);

- On March 22, 2012, plaintiff requested detox for her use of "computer duster" inhalant for the past six months (Tr. 1299-1307);

- On May 23, 2012, plaintiff was caught by police huffing from a dust-remover can (Tr. 1424-1426);

- On June 10, 2012, plaintiff denied the use of street drugs (Tr. 1446-1448);

- On July 4, 2012, plaintiff was taken to the emergency room after suspected use of bath salts (Tr. 1484-1489);

- On July 5, 2012, plaintiff denied using bath salts after being committed involuntarily for overdose and suicidal ideations (Tr. 1325-1358, 1490-1506);

- On July 14, 2012, plaintiff denied using alcohol or IV drugs (Tr. 1506-1508); and

- On September 29, 2012, plaintiff went to the emergency room after being caught huffing canned air (Tr. 1541-1544).

As to plaintiff's efforts to secure scheduled drugs from her medical providers, the record reveals the following:

- On July 11, 2005, plaintiff was given Ativan;

- On April 17, 2007, she was given prescriptions for Darvocet-N;

- On October 17, 2007, plaintiff was told by her doctor to stop using narcotic pain medication to address her back pain;

- On September 16, 2008, plaintiff was given Dilaudid;

- On September 17, 2008, plaintiff was given ASA/butalbital/caffeine/codeine;

- On September 18, 2008, plaintiff was given Dilaudid;

- On September 26, 2008, plaintiff was given Dilaudid;

- On February 28, 2009, plaintiff was given Nubain;

- On March 3, 2009, plaintiff was given Dilaudid;

- On May 1, 2009, she was given two injections of Morphine;

- On September 6, 2009, she was given a Morphine injection and a prescription for Vicodin;

- On September 9, 2009, she was given two injections of Morphine;

- On December 2, 2009, she was given a prescription for Hydrocodone;

- On December 20, 2009, she was given an injection of Fioricet;

- On January 17, 2010, she was given an injection of Valium;

- On January 23, 2010, she was given a prescription for Norco;

- On April 18, 2010, she was given a prescription for Percocet;

- On April 22, 2010, she was given a prescription for Vicodin;

- On July 10, 2010, plaintiff went to the emergency room for an overdose after taking five drinks and three Requip tablets (a drug that produces the same effects as dopamine);

- On July 22, 2010, she was given an injection of Morphine;

- On September 8, 2010, she was given an injection of Demerol;

- On September 27, 2010, she was given an injection of Morphine and a prescription for Vicodin;

- On September 30, 2010, she was given an injection of Morphine and a prescription for Percocet;

- On October 22, 2010, she was given an injection of Morphine and a prescription for Norco;

- On January 17, 2011, she was given a prescription for Vicoprofen;

- On January 18, 2011, she was given an injection of Nubain;

- On July 15, 2011 -- nine days after she was discharged from the hospital which had come about through drug abuse -- plaintiff was given a prescription for Xanax;

- On September 24, 2011, plaintiff was treated for an overdose of Hydrocodone and Darvocet;

- On October 18, 2011, plaintiff's medications included Klonopin;

- On December 4, 2011, she was given a prescription for Lortab;

- On December 5, 2011, she was given a prescription for Percocet;

- On January 8, 2012, she was given an injection of Nubain and a prescription for Lortab;

- On January 18, 2012, she was given two injections of Morphine and listed Lorcet as a current home medication;

- On March 5, 2012, she became abusive with ER staff because the doctor refused to give plaintiff narcotics;

- On March 15, 2012, she was given an injection of Morphine;

- On April 5, 2012, she was given two shots of Morphine;

- On May 10, 2012, she was given an injection of Morphine and a prescription for Talwin;

- On May 20, 2012, she was given an injection of Dilaudid and a prescription for Vicodin;

- On May 21, 2012, she was given an injection of Dilaudid;

- On May 24, 2012 -- the day after she was taken to the hospital for huffing from a dust removal can -- she was given injections of Ativan and Dilaudid;

- On May 26, 2012, she was given an injection of Dilaudid and a prescription for Vicoprofen;

- On May 28, 2012, plaintiff was given an injection of Ativan and a prescription for Percocet after requesting an injection of Dilaudid;

- On May 31, 2012, plaintiff was given an injection of Ativan and a prescription for Percocet;

- On June 3, 2012, Dr. Gilbreth said he believed plaintiff was addicted to narcotics, yet he gave her an injection of Ativan and two oral Percocet -- this was after plaintiff said that she would do whatever it takes to obtain narcotics, even if illegal;

- On June 10, 2012, plaintiff received an injection of Nubain, Morphine and Ativan;

- On June 12, 2012, plaintiff received an injection of Nubain;

- On June 17, 2012, plaintiff received an injection of Morphine;

- On June 22, 2012, plaintiff went to the ER and asked for Vicoprofen but was refused;

- On June 26, 2012, plaintiff received an injection of Morphine and Fentanyl;

- On June 27, 2012, plaintiff requested a refill of narcotic pain medication but was denied;

- On June 30, 2012, plaintiff received an injection of Morphine and a prescription for Percocet;

- On July 2, 2012, plaintiff was given an injection of Ativan and a prescription for Vicoprofen and Ativan;

- On July 3, 2012, plaintiff went to the ER after an assault and was offered Tylenol but refused;

- On July 4, 2012, plaintiff was given an injection of Ativan;

- On July 14, 2012 -- a week after her discharge from the hospital for an overdose -- plaintiff was given an injection of Morphine and a prescription for Percocet;

- On July 15, 2012, plaintiff was given two injections of Morphine;

- On July 2, 2012, plaintiff was given an injection of Morphine;

- On August 1, 2012, plaintiff was given a prescription for Fioricet;

- On August 6, 2012, plaintiff got angry when she was refused narcotics at CoxHealth Urgent Care, and afterward got angry at Ozarks Community Hospital Medicaid Clinic when she was refused narcotics;

- On August 23, 2012, plaintiff was given Norco and Hydrocodone;

- On November 8, 2012, plaintiff was given an injection of Demerol and a prescription for Vicodin;

- On December 15, 2012, plaintiff was given an injection of Ativan and Fentanyl and an oral dose of Hydrocodone;

- On December 17, 2012, she was given a prescription for Klonopin.

Although Tramadol is not currently a controlled substance, as of August 18, 2014, it will be a Schedule IV controlled substance. See 79 FR 37623-01, 2014 WL 2946579 (F.R.) (July 2, 2014). The record shows that plaintiff was also routinely given prescriptions for that drug: January 22, 2009; May 1, 2009; September 4, 2009; March 8, 2010; June 21, 2010; July 1, 2010; October 18, 2011; August 23, 2012; September 24, 2012; October 2, 2012; and November 12, 2012.

Plaintiff's drug-seeking behavior is made even clearer when one reads the entries made about the results of examinations and tests performed during her many trips to the doctor and emergency room about pain. Generally, the results reflect no objective basis for plaintiff's complaints of pain. For example:

- On September 19, 2008, plaintiff went to the ER complaining about recurring headaches, but a MRI showed a normal brain (Tr. 609-610);

- On December 24, 2008, plaintiff went to the ER for chest tightness, and her x-rays and ECG were normal and unchanged since an August 16, 2007, study (Tr. 659-669);

- On October 18, 2012, plaintiff complained of chest pain, but her cardiac monitor rhythm, sinus rhythm, and chest x-rays were normal (Tr. 1138-1149);

- On January 4, 2012, plaintiff went to the ER for migraine and left without being treated (Tr. 1218-1226, 1242);

- On May 10, 2012, plaintiff was treated for complaints of flank pain and abdominal pain. CT scan showed: no evidence of hydronephrosis; a few calcific densities in the lower abdomen probably vascular; and an ovarian cyst identified in April 2012 faintly present but appeared somewhat smaller; and no free fluid collection (Tr. 1413-1417;

- On June 27, 2012, an abdominal CT scan of plaintiff showed no significant findings other than adnexal tissue greater in the right and the colon wall was somewhat limited with lack of interluminal contrast and soft tissue density at margins of vaginal cuff and bladder (Tr. 1466-1467);

- On July 30, 2012, plaintiff was treated for complaints of headache and chest pain described as sharp and stabbing. Plaintiff's behavior and mood were within normal limits. Plaintiff had moderate tenderness of the xyphoid. Plaintiff's cardiovascular and neurological exam findings were within normal limits (Tr. 1519-1521);

- On August 23, 2012, plaintiff was treated for complaints of neck and back stiffness after a fall in the bath tub the day before. Plaintiff had mild back pain with decreased range of motion with all movement. Cervical spine x-rays were negative. Lumbar spine x-rays showed only mild degenerative facet changes in the lower lumbar spine with no changes since the x-rays of July 3, 2012 (Tr. at 1533-1537);

- On October 22, 2012, plaintiff was treated for complaints of chronic knee pain. Plaintiff had tenderness in the posterior aspect of the right knee. Right lower extremity venous duplex ultrasound showed no evidence of acute or chronic thrombus in the

deep veins of the right lower extremity. No medications were administered. The diagnosis was knee pain (Tr. 1548-1549, 1553);

- On December 15, 2012, plaintiff was admitted to CoxHealth for observation due to complaints of anxiety, facial drawing and tightness, and chest pain. The doctor described plaintiff as "an ER abuser with 4 visits per month" which was actually a low estimate. The examination showed an obese, anxious female not in any acute distress. Facial tightness was her chief complaint, and chest pain was more of an afterthought. Plaintiff had mild chest wall tenderness to palpation. The diagnosis was anxiety reaction and chest wall pain. Radiology reports for chest, heart, and lung exams were negative (Tr. 1557-1561, 1565-1572).

Here, the ALJ found that plaintiff's combined impairments, including her substance abuse and dementia secondary to substance abuse, prevented plaintiff from working (Tr. 16-23). However, the ALJ also found that, should plaintiff cease her substance abuse, she would be able to perform simple jobs existing in significant numbers within the national economy (Tr. 23-31, 425-26). Because plaintiff's substance-use disorders were a contributing factor material to the determination of disability in this case, the ALJ properly found that plaintiff was not disabled (Tr. 31).

When the record demonstrates that a plaintiff's remaining limitations are not disabling during a period of abstinence, the ALJ may find the plaintiff's substance-use disorders to be material. See SSR 13-2p. Here, the ALJ reviewed the record and observed that:

- Plaintiff appeared to have largely abstained from substance abuse from 2007 until early 2011 (Tr. 19, 24);

- Plaintiff reported improved mental functioning in 2008 and 2009 (Tr. 24, 28-29);

- Plaintiff reported in an April 2008 function report that she could perform household chores, run errands, and concentrate well enough to read, watch a two-hour movie, and use a computer for three to four hours (Tr. 24, 29, 358-61);

- Plaintiff reported to her doctor in 2008 and 2009 that medications improved her mental symptoms (Tr. 28, 605, 611, 613);

- Plaintiff managed to work in 2009 and 2010[26] (Tr. 19-22, 28, 30);

- Plaintiff worked until June 2011 as a retail clerk (Tr. 19-20, 309-13, 411);

- Plaintiff earned almost $12,000 in 2009 and more than $15,000 in 2010 (Tr. 19-20, 308); and

- In a letter to the ALJ, plaintiff's friend stated that plaintiff had physical difficulties while working at Hobby Lobby, but the writer made no reference to mental symptoms or substance abuse (Tr. 30, 418).

Based on these facts in the record, the ALJ concluded that plaintiff's mental functioning would significantly improve if she abstained from substance abuse (Tr. 19-20).

As to plaintiff's credibility, the ALJ found that she had exaggerated her mental symptoms and demonstrated an aversion to work (Tr. 28-29). The ALJ noted from the record that:

- Psychometric testing in February 2008 showed that plaintiff was either exaggerating her mental symptoms or "crying for help" (Tr. 28, 449);

- A diagnostic interview in July 2012 was consistent with feigned psychosis (Tr. 1350-1351), although a doctor who reviewed the results did not believe plaintiff was deliberately feigning psychosis and diagnosed her with dementia "secondary to substance abuse" (Tr. 20, 1327); and

---

[26]I also note that 2009 and 2010 were plaintiff's highest annual lifetime earnings.

▸ Plaintiff had a sporadic work history, calling into question her motivation to work (Tr. 29).

Based on my review of the record, the ALJ properly concluded that plaintiff had the physical and mental capacity to work if she would stop abusing drugs.

## B. THE WEIGHT GIVEN TO OPINION EVIDENCE

Plaintiff argues that "materiality" is a medical finding and that requires medical evidence, which plaintiff construes to be limited to opinion evidence provided by a treating or examining physician.

Determining whether substance-use disorders are material is the responsibility of the ALJ, not a doctor. Cox v. Astrue, 495 F.3d 614, 619-20 (8th Cir. 2007). The Eighth Circuit has recognized that an ALJ is not required to rely on a particular physician's opinion in evaluating a plaintiff's RFC. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011).

In evaluating a plaintiff's limitations, an ALJ considers the medical opinions along with the rest of the relevant evidence. 20 C.F.R. §§ 404.1527 and 416.927; SSR 96-2p, 96-5p, 96-6p, and 06-03p. When evaluating opinion evidence from an acceptable medical source, an ALJ should consider these factors:

▸ How long the source has known and how frequently the source has seen the claimant;

▸ How consistent the opinion is with other evidence;

▸ The degree to which the source presents relevant evidence to support an opinion;

▸ How well the source explains the opinion; and

▸ Whether the source has a specialty related to the plaintiff's impairments.

20 C.F.R. §§ 404.1527(c) and 416.927(c); SSR 06-03p.

In this case, the ALJ considered the medical opinions and provided justification for the weight he assigned to each (Tr. 19-21, 28-30).

## 1.    *EVA C. WILSON, PSY.D.*

The ALJ considered the opinion of psychologist Eva C. Wilson, Psy.D., who examined plaintiff in February 2008 (Tr. 19-21, 28, 30, 447-49). Dr. Wilson opined that plaintiff's depression would cause her great difficulty in maintaining full-time employment due to an inability to concentrate (Tr. 21, 449).

The ALJ considered Dr. Wilson's opinion and assigned it little weight (Tr. 20-21, 28, 30). The ALJ found that Dr. Wilson's opinion essentially constituted an opinion on an issue reserved to the Commissioner (Tr. 21, 449). 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ also found that Dr. Wilson's opinion was inconsistent with plaintiff's ability to work in 2009 and 2010 (Tr. 21), in that plaintiff was able to work as a retail clerk for more than three years after Dr. Wilson issued her opinion (Tr. 309-313, 411). In addition, the ALJ found that Dr. Wilson's opinion did not factor into her analysis the impact of plaintiff's substance abuse on her limitations (Tr. 21, 447-449). The ALJ acknowledged that plaintiff may have been abstaining from substance use at the time Dr. Wilson issued her opinion (Tr. 21); however, Dr. Wilson appeared to accept plaintiff's reports that her substance abuse ended in the 1990s (Tr. 21, 448). The ALJ noted that Dr. Wilson likely was unaware that plaintiff had received treatment for methamphetamine addiction in 2007, the year prior to Dr. Wilson's examination (Tr. 21, 945). Based on these concerns, the ALJ gave the psychologist's opinion less weight on the question of materiality.

## 2.    *SHAROL MCGEHEE, PSY.D.*

The ALJ considered the opinion of psychologist Sharol McGehee, Psy.D., who examined plaintiff in July 2010 (Tr. 19-20, 28, 944-947). Dr. McGehee diagnosed plaintiff as having schizophrenia and assessed a GAF score of 21 (Tr. 20, 28, 947).

The ALJ considered Dr. McGehee's GAF assessment and assigned it little weight (Tr. 28). The ALJ found that the assessment reflected psychosocial stressors unrelated to an RFC determination, such as family difficulties and financial problems (Tr. 28, 947). The ALJ also found that Dr. McGehee's assessment was inconsistent with the fact that plaintiff continued to work (Tr. 28). The ALJ also found that Dr. McGehee appeared to rely heavily on plaintiff's subjective complaints of hallucinations and delusions (Tr. 28, 944-47), even though Dr. Wilson had earlier found that plaintiff exaggerated her mental symptoms during testing (Tr. 28, 449).

### 3.     *BECKY BRECKNER*

The ALJ considered the opinion of plaintiff's counselor, Becky Breckner (Tr. 21-22, 24, 29-30, 590-91, 795-96).

Plaintiff saw Ms. Breckner for therapy in 2007 and 2008 (Tr. 591). In June 2008, Ms. Breckner submitted a letter in which she stated that plaintiff's inability to address her medical and psychiatric problems interfered with her ability to maintain employment (Tr. 591). In November 2009, Ms. Breckner completed a medical source statement in which she assessed marked limitations in plaintiff's ability to carry out detailed instructions, maintain attention and concentration for extended periods, make simple work-related decisions, work with others, interact appropriately with the public, and respond appropriately to changes in the work setting (Tr. 21-22, 795-96).

The ALJ considered Ms. Breckner's opinion but gave it little weight (Tr. 21-22, 24, 29-30). Ms. Breckner was not a treating source entitled to controlling weight under the regulations. As a counselor, Ms. Breckner was not an acceptable medical source under the regulations (Tr. 591, 796). 20 C.F.R. §§ 404.1513(d) and 416.913(d). Other-source opinions are not entitled to controlling weight, but are weighed using factors analogous to those used to

weigh the opinions of acceptable medical sources. 20 C.F.R. §§ 404.1527(c) and 416.927(c); SSR 06-03p.

The ALJ weighed Ms. Breckner's opinion under SSR 06-03p and provided reasons for discounting her opinions (Tr. 21-22, 24, 29-30). The ALJ found Ms. Breckner's opinions were internally inconsistent (Tr. 22, 24, 29-30), observing that:

- Although Ms. Breckner indicated that plaintiff was markedly limited in her ability to make simple, work-related decisions, she indicated that there was no evidence of limitation in carrying out short and simple instructions, or in understanding and remembering detailed instructions (Tr. 22, 795), and opined that plaintiff could, during a full-time workweek, understand, remember, and carry out simple instructions, make simple work-related decisions, respond appropriately to supervision and usual work situations, and deal with changes in a work setting (Tr. 22, 796);

- Ms. Breckner did not submit any treatment notes to support her opinions (Tr. 21, 590-91, 795-96); plaintiff's representative confirmed at the hearing that Ms. Breckner was unwilling to submit her treatment notes to the agency (Tr. 117-18); and the ALJ made three unsuccessful attempts to subpoena the treatment notes (Tr. 21, 419-21);

- Ms. Breckner did not appear to consider the possible impact of plaintiff's substance-use disorders on her mental functioning (Tr. 22, 590-91, 795-96); and

- Ms. Breckner's opinion was inconsistent with the fact that plaintiff was actually working at the time Ms. Breckner reendered her opinion (Tr. 22).

I find that the ALJ has sufficient grounds to discount Ms. Breckner's opinion based on the above facts.

## C.    REMANDING THE CASE FOR CONSIDERATION OF NEW EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

Lastly, plaintiff argues that the Appeals Council should have remanded the case to the ALJ for reconsideration of the additional evidence presented after the ALJ's decision.

Here, the Appeals Council considered additional evidence submitted after the ALJ's decision and, in denying review, observed that the evidence "[did] not provide a basis for changing the [ALJ's] decision." (Tr. 1-5).

When the Appeals Council considers new and material evidence and denies review, the district court does not review the Appeals Council's denial but instead "must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000). The question before the district court is not whether the new evidence, taken alone, supports the ALJ's finding, but whether the record as a whole, when the new evidence is considered along with all the evidence in the original record, constitutes substantial evidence for the ALJ's decision. Perks v. Astrue, 687 F.3d 1086, 1093 (8th Cir. 2012).

In this case, the additional evidence consisted of treatment records and mental status examinations from May to December 2012 (Tr. 1365-1572). When considered along with the evidence that was before the ALJ, the additional evidence does not undermine the ALJ's determination that plaintiff was not disabled:

- ▸ In November and December 2012, plaintiff showed delusional thought processes and content (Tr. 1409-10). The additional evidence indicated, however, that she continued to struggle with substance abuse throughout 2012.

- ▸ In May, plaintiff was caught huffing canned air and said she did not want help stopping (Tr. 1424-26);

- ▸ In July, plaintiff was admitted to the hospital after appearing delirious and psychotic apparently due to injecting bath salts (Tr. 1325-58, 1485, 1492-1502);

- In September, plaintiff returned to the hospital after huffing canned air (Tr. 1541); and

- Plaintiff's medical records show that she received injections or prescriptions for controlled substances 50 times during 2012; and if Tramadol is added to the list, that number jumps to 54. Additionally, she requested and was denied narcotics on several more occasions.

This evidence supports the ALJ's finding that plaintiff's mental functioning continued to be impaired by her substance abuse disorders, even after the ALJ had all of the evidence on which he based his decision (Tr. 19-21).

Furthermore, the evidence supports the ALJ's finding that plaintiff exaggerated her symptoms (Tr. 28). During a mental status examination in May 2012, plaintiff showed signs of dishonesty regarding her symptoms, treatment, and diagnoses (Tr. 1380, 1383).

Finally, the additional evidence shows that plaintiff frequented the emergency room in 2012, complaining of headaches and other pain (Tr. 1413-1572). An emergency room doctor stated that plaintiff's headaches were likely rebound or withdrawal headaches associated with narcotic addiction (Tr. 1436-37, 1444). Plaintiff demanded narcotic pain medication, refused other headache medications, and stated that she was willing to obtain narcotics illegally (Tr. 1436, 1444, 1460, 1526-27). This evidence is consistent with the ALJ's finding that plaintiff may have over-reported headache symptoms to gain access to pharmaceutical narcotics (Tr. 27).

Plaintiff has failed to show that the evidence submitted to the Appeals Council would have caused the ALJ to reach a different decision in this case. Therefore, considering the entire record, including new evidence submitted to the Appeals Council, I find that substantial evidence supports the ALJ's finding that plaintiff was not disabled.

## VII.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled within the meaning of the Social Security Act.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 30, 2014